

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-16-00372-CR

EX PARTE ELIDA URIBE

----------

FROM THE 367TH DISTRICT COURT OF DENTON COUNTY
TRIAL COURT NO. F-2009-1488-E

----------

## OPINION

----------

## I. Introduction

Appellant Elida Uribe appeals the trial court's denial of her habeas application, arguing that she received ineffective assistance of counsel with regard to the immigration consequences of her guilty plea and that, but for counsel's deficient performance, she would not have pleaded guilty and would have insisted on going to trial. *See* Tex. Code Crim. Proc. Ann. art. 11.09 (West 2015); *Padilla v. Kentucky*, 559 U.S. 356, 369, 130 S. Ct. 1473, 1483 (2010); *see*

*also Le v. State*, 300 S.W.3d 324, 326–27 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (discussing jurisdiction over habeas application based on "collateral legal consequences" from misdemeanor conviction). We affirm.

## II. Background

Lewisville police arrested Uribe, a Mexican citizen, on March 31, 2009, alleging that she had beaten her "sister," Mariana Segura,[1] "with her fists and stabbed her with a knife." The police interviewed Segura in the hospital emergency room, where she reported that Uribe had knocked her to the ground, repeatedly punched her in the face, hit her in the face with a purse, kicked her in the mouth, and cut her forearm with a six-inch steak knife, leaving a one-inch laceration that required stitches. An officer photographed Segura's injuries, which included the laceration and other bumps, bruises, and scratches. Segura gave the officer permission to retrieve the knife from the apartment where the assault occurred. The police also took photographs that depicted the knife and blood on the carpet from the scene of the assault.

---

[1]Segura, whose last name appears both as "Segura" and "Sequra" in the various case documents, was not Uribe's sister; rather, according to Uribe, they had been such close friends that they started telling people that they were sisters. The police report reflected that Segura told police that Uribe was her sister although in her written statement to the police, Segura stated that Uribe had been her friend. Uribe called Segura her sister in her written police statement.

After receiving and waiving her *Miranda* rights, Uribe recounted to the police her version of the encounter, admitting that she had assaulted Segura.[2] She also admitted that she had grabbed a steak knife from the kitchen but said that Segura was cut when Segura reached for it.[3] Uribe was indicted for aggravated assault with a deadly weapon,[4] a second-degree felony offense with a punishment range of two to twenty years' confinement and up to a $10,000 fine. *See* Tex. Penal Code Ann. §§ 12.33, 22.02(b) (West 2011).

---

[2]In her handwritten and signed statement to the police, Uribe stated,

> I walked to her and punched her straight on the face and dropped her on the floor and started to punch her on the face and pulled her hair and I got a knife to scare her because she is terrified of them and she tried to push it of[f] my hand and cut herself after that I talked more mess and I grabbed the chunks of hair from the floor and threw them at her and told her to ask Valerie to glue them back on and I left.

[3]The "Details of Arrest" portion of the police report reflect that with regard to the assault, Uribe said,

> I beat her ass, I got on top of her and punched her and punched her, and couldn't stop myself, I kicked her in the face. I then got up and grabbed a steak knife and wanted to scare her because I know she is terrified of them, and she went to grab it away she got cut.

[4]Uribe's indictment alleged that she had intentionally, knowingly, or recklessly caused bodily injury to Segura by striking her with her hand and that she had used or exhibited a deadly weapon (a knife) that in the manner of its use or intended use was capable of causing death or serious bodily injury during the commission of the assault. *See* Tex. Penal Code Ann. § 1.07(a)(17)(B) (West Supp. 2016) (defining "deadly weapon"), § 22.02(a)(2) (West 2011) (elements of aggravated assault with a deadly weapon), § 22.01(a) (West Supp. 2016) (elements of assault).

Uribe pleaded guilty to Class A misdemeanor assault as a lesser-included offense[5] in exchange for 270 days' confinement in county jail with no fine and no family violence finding.[6]  *See id.* § 12.21 (West 2011) (stating that an individual adjudged guilty of a Class A misdemeanor shall be punished by a fine not to exceed $4,000, confinement in jail for a term not to exceed one year, or both such fine and confinement).  Uribe's plea agreement included the statement, "I understand that if I am not a citizen of the United States of America a plea of guilty or nolo contendere for the offense charged may result in deportation, the exclusion from admission to this country, or the denial of naturalization under Federal law."

The trial court signed the judgment of conviction on September 17, 2009. A few months later, the U.S. Department of Homeland Security (DHS) served Uribe with a notice to appear, charging her with removability under 8 U.S.C. § 1182(a)(6)(A)(i).[7]

---

[5]A person commits assault if she intentionally, knowingly, or recklessly causes bodily injury to another or intentionally or knowingly threatens another with imminent bodily injury; an assault is usually a Class A misdemeanor.  Tex. Penal Code Ann. § 22.01(a), (b).

[6]As set out above, Segura and Uribe were not family members but they had referred to each other as sisters in their conversations with the police.

[7]8 U.S.C. § 1182(a)(6)(A)(i) provides that aliens who are inadmissible because they are "present in the United States without being admitted or paroled, or who arrive[d] in the United States at any time or place other than as designated by the Attorney General," are ineligible to receive visas and ineligible to be admitted to the United States.  8 U.S.C.A. § 1182(a)(6)(A)(i) (West 2005); *see also id.* § 1227(a)(1)(A) (West 2005 & Supp. 2016) (defining as deportable

4

Seven years later, in 2016, Uribe filed her application for writ of habeas corpus, to which she attached copies of the 2009 indictment and judgment of conviction, an affidavit in which she set out another version of the facts underlying the conviction and raised a self-defense claim,[8] DHS's notice to appear, her former immigration counsel's affidavit, and her current immigration counsel's affidavit.

Uribe's current immigration counsel averred,

> Based on the legal advice of both [Uribe's former criminal defense counsel and her former immigration counsel], Mrs. Uribe-Guerrero accepted a plea offer in her criminal case that resulted in a sentence of 270 days in state custody. At the time, neither her criminal attorney nor her immigration attorney advised Mrs. Uribe-Guerrero that as a result of that plea, she would become ineligible to request cancellation of removal in immigration court.[9] Specifically,

---

any alien who "at the time of entry or adjustment of status was within one or more of the classes of aliens inadmissible by the law existing at such time").

[8]In her affidavit, Uribe explained that she had confronted Segura about spreading lies about her and told Segura "that if she was that mad at [Uribe] she need to hit [Uribe], so [Segura] did." Uribe hit her back and they started to fight. Uribe averred that Segura told her at one point during the altercation that she was going to bring her butterfly knife to finish it, so to protect herself, Uribe went into the kitchen, grabbed a knife from the sink, and showed it to Segura, telling her that she was prepared to protect herself if Segura came at her. Uribe denied having ever touched Segura with the knife but said that the interviewing officer did not believe her self-defense claim and said she "was made guilty from the beginning."

[9]*See* 8 U.S.C.A. § 1229b (West 2005 & Supp. 2016) ("Cancellation of removal; adjustment of status"). Under 8 U.S.C. § 1229b(b), the attorney general may cancel removal of, and adjust to the status of an alien lawfully admitted for permanent residence, an alien who is inadmissible or deportable if the alien (1) has been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of such application; (2) *has been a person of good moral character during such period*; (3) has not been

5

an individual who is confined to more than 180 days in jail loses their eligibility for this relief.[10]  As a result of acting on the erroneous legal advice given by both lawyers, Mrs. Elida Uribe's only remaining option is removal.

In his affidavit, her former immigration counsel stated that he did not tell Uribe's former criminal defense attorney

> that [8 U.S.C. § 1101(f)(7)] provided that no person shall be regarded as a person of good moral character who has been confined more than 180 days as a result of a conviction.  It was not until [he] received [a] memo from [ICE attorney Judson] Davis . . . in August 2010 that [he] realized that Ms. Uribe would have a problem with good moral character due to the fact that the number of days served as a result of the conviction were more than 180 days.

Uribe stated in her affidavit that her former immigration attorney had improperly advised her and her criminal defense attorney and stated, "If I would have known that the plea for misdemeanor assault would have immigration consequences, I would not have accepted the guilty.  I would have pushed my

---

convicted of an offense under 8 U.S.C. §§ 1182(a)(2), 1227(a)(2), or 1227(a)(3); and (4) establishes that removal would result in exceptional and extremely unusual hardship to the alien's spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence.  *Id.* § 1229b(b).

[10]8 U.S.C. § 1101(f)(7) provides that no person shall be regarded as or found to be a person of good moral character who, during the period for which good moral character is required to be established, is or was "one who during such period has been confined, as a result of conviction, to a penal institution for an aggregate period of one hundred and eighty days or more, regardless of whether the offense, or offenses, for which he has been confined were committed within or without such period."  *Id.* § 1101(f)(7) (West 2005).  Uribe did not reveal in her affidavit whether she met any of the remaining elements necessary to cancel her removal.

criminal attorney to pursue a different direction in my case, including going to trial."

The State attached to its answer to Uribe's application copies of Uribe's plea bargain documents; the original police report pertaining to Uribe's March 31, 2009 arrest, which contained Uribe's oral statements to the police about the events of that evening; photographs of Segura's injuries, the knife, and the blood-stained carpet; Uribe's written statement to the police; Segura's written statement to the police; Uribe's book-in photo; Segura's emergency protective order; and the court settings with plea bargain data. The State also filed proposed findings of fact and conclusions of law, which the trial court adopted.

Among other things, the trial court found the following in its findings of fact:

2. [Uribe] made a judicial confession and signed plea paperwork that she read, understood, and her attorney explained, an admonishment regarding the immigration consequences of her plea.

3. [Uribe] filed an affidavit from July 15, 2016, wherein she claimed that she was the victim of the assault, Mariana Segura hit her first, Ms. Segura threatened [Uribe] with a knife, [Uribe] only retrieved a knife in self-defense, Ms. Segura was never cut by the knife, and police officers did not believe [Uribe]. [Uribe] also claimed that had she been given correct immigration advice she would not have taken a plea deal and would have "pushed her criminal attorney to pursue a different direction in [the] case, including going to trial."

4. [Uribe] is not credible.

5. The police report and Ms. Segura's statements from March 31, 2009, detailed the assault: [Uribe] confronted Ms. Segura; [Uribe] knocked her to the ground; [Uribe] punched her in the face repeatedly; [Uribe] hit Ms. Segura with a purse numerous times; [Uribe] kicked Ms. Segura in the face; the beating caused Ms.

7

Segura to lose consciousness; [Uribe] retrieved a knife from the kitchen; and Ms. Segura was cut by the knife, requiring stitches.

6. Officer Richard Crociata took pictures of Ms. Segura's injuries and those pictures show injuries to Ms. Segura's face, eye, lip, and arm.

7. On March 31, 2009, [Uribe] waived her *Miranda* rights and gave Officer Crociata and Officer Lee Noble verbal and written statements.

8. On March 31, 2009, [Uribe] told officers:

I beat her ass, I got on top of her and punched her, and couldn't stop myself, I kicked her in the face. I then got up and grabbed a steak knife and wanted to scare her because I know she is terrified of them, and she went to grab it away and got cut.

9. In her March 31, 2009 written statement, [Uribe] admitted she was "fed up" with rumors started by Ms. Segura so [Uribe] walked up to Ms. Segura, punched Ms. Segura "straight on the face," "dropped her on the floor," and continued to punch Ms. Segura in the face and pulled Ms. Segura's hair. [Uribe] further admitted that she grabbed a knife to scare Ms. Segura and Ms. Segura was cut when Ms. Segura tried to push the knife out of [Uribe]'s hand.

10. None of the evidence collected from the night of the assault suggests that Ms. Segura instigated the fight or threatened [Uribe].

The trial court concluded that even if Uribe's counsel was found to be constitutionally deficient in his representation, Uribe had failed to show that there was a reasonable probability that, but for his errors, she would not have pleaded guilty because it would not have been rational under the circumstances when she would have risked a harsher penalty with the same immigration consequences. The trial court further concluded that rejecting the plea bargain would not have

8

been rational because the evidence showed that Uribe had committed aggravated assault with a deadly weapon and that if she had proceeded to trial, "it is likely she would have been found guilty." And it concluded that Uribe's claimed legal and factual defenses in her 2016 affidavit were not credible considering the other evidence, including her signed confession from 2009; that rejecting the plea bargain would not have been rational when Uribe did not state that immigration consequences were her primary concern in 2009 when she was facing up to twenty years in prison; and that Uribe had failed to show that the State would have offered a different plea bargain that would have helped her avoid negative immigration consequences. The trial court further stated that rejecting the plea bargain was not rational because if Uribe had taken the aggravated-assault-with-a-deadly-weapon case to trial, she would not have been eligible for probation from the judge[11] and it was unlikely that she would have received it from the jury in light of the facts.

In making its conclusions, the trial court stated that it looked at the following factors regarding whether it would have been rational for Uribe to reject the plea bargain: evidence of her guilt; evidence of her factual or legal defenses; whether she had presented evidence that her immigration status had been her primary concern; her plea deal compared to the penalties she risked at trial;

---

[11]See Tex. Code Crim. Proc. Ann. art. 42.12, § 3g(a)(2) (West Supp. 2016) (providing that judge-ordered community supervision provisions do not apply to a defendant when it is shown that a deadly weapon was used or exhibited during the commission of a felony offense).

9

whether she presented evidence that any other plea deal would have helped her avoid negative immigration consequences; and whether she presented evidence regarding the likelihood of obtaining probation if she had been convicted at trial.[12]

### III. Discussion

We did not request additional briefing in this case, *see* Tex. R. App. P. 31.1, and will review whether the habeas court abused its discretion by denying Uribe's application based on the ineffective-assistance-of-counsel ground she presented in her application.

### A. Standard of Review and Applicable Law

As we have previously stated,

We review a trial court's denial of the relief requested in an application for a writ of habeas corpus under an abuse of discretion standard. This means we view the record in the light most favorable to the trial court's ruling and afford great deference to its findings and conclusions, especially when they involve determinations of credibility and demeanor. Such deference must be given to the trial court even when all the evidence is submitted by affidavits. The test for whether the trial court abused its discretion is whether its ruling was arbitrary or unreasonable. The mere fact that a trial court may decide a matter within its discretionary authority in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion occurred. We will only overrule the trial court's ruling on an application for a writ of habeas corpus if the court's ruling was outside the zone of reasonable disagreement.

---

[12]The trial court cited *Ex parte Murillo*, 389 S.W.3d 922, 928–31 (Tex. App.—Houston [14th Dist.] 2013, no pet.), *abrogated on other grounds by Chaidez v. United States*, 133 S. Ct. 1103, 1113 (2013), and *Ex parte Fassi*, 388 S.W.3d 881, 888–90 (Tex. App.—Houston [14th Dist.] 2012, no pet.), as the source of these factors. We discuss these cases below.

*Ex parte Moreno*, 382 S.W.3d 523, 526 (Tex. App.—Fort Worth 2012, pet. ref'd) (citations omitted). The trial court is not required to accept an applicant's factual statements made in his or her affidavit. *Id.* at 528–29 (observing that when the trial court weighs conflicting evidence, it must make a judgment call on the evidence's credibility).

A defendant is entitled to effective assistance of counsel when entering a guilty plea. *Id.* at 526 (citing *Hill v. Lockhart*, 474 U.S. 52, 58–59, 106 S. Ct. 366, 370–71 (1985); *Ex parte Harrington*, 310 S.W.3d 452, 458 (Tex. Crim. App. 2010)); *see also Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984) ("Unless a defendant makes both showings [deficient performance of counsel and prejudice], it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable."). As stated by our court of criminal appeals,

> An applicant for a post-conviction writ of habeas corpus bears the burden of proving his claim by a preponderance of the evidence. To demonstrate that he is entitled to post-conviction relief on the basis of ineffective assistance of counsel, an applicant must demonstrate that (1) counsel's performance was deficient, in that it fell below an objective standard of reasonableness, and (2) the applicant was prejudiced as a result of counsel's errors, in that, but for those errors, there is a reasonable probability of a different outcome. In the context of a collateral challenge to a guilty plea, the focus of the prejudice inquiry is on "whether counsel's constitutionally ineffective performance affected the outcome of the plea process," and on whether a defendant has shown that "but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."

11

*Ex parte Torres*, 483 S.W.3d 35, 43 (Tex. Crim. App. 2016) (citations omitted). In the *Padilla* context, when the prejudice prong of the *Strickland* test is dispositive, we need address only that prong on appeal. *Murillo*, 389 S.W.3d at 927 (citing *Fassi*, 388 S.W.3d at 887).

The test for determining the validity of a plea is whether it represents a voluntary and intelligent choice among alternative courses of action open to the defendant. *Ex parte Karlson*, 282 S.W.3d 118, 129 (Tex. App.—Fort Worth 2009, pet. ref'd). To meet the burden under *Strickland*'s prejudice prong, the applicant must convince the court that a decision to reject the plea bargain would have been rational under the circumstances, but he need not show that he would have received a more favorable outcome at trial. *Johnson v. State*, 169 S.W.3d 223, 231 (Tex. Crim. App. 2005), *cert. denied*, 546 U.S. 1181 (2006).[13] The test is objective and turns on what a reasonable person in the defendant's shoes

---

[13]The court of criminal appeals has explained that

> [i]n the ineffective assistance of counsel context, the narrowed prejudice inquiry is designed to ensure that the defendant would actually have availed himself of the proceeding in question, so that he really is in the same position as someone whose rights were denied by the trial court: "counsel's deficient performance must actually cause the forfeiture [of the proceeding in question]. If the defendant cannot demonstrate that, but for counsel's deficient performance, he would have [availed himself of that proceeding], counsel's deficient performance has not deprived him of anything, and he is not entitled to relief."

*Johnson*, 169 S.W.3d at 231–32 (quoting *Roe v. Flores-Ortega*, 528 U.S. 470, 484, 120 S. Ct. 1029, 1038 (2000)).

would do.  *Ex parte Ali*, 368 S.W.3d 827, 835 (Tex. App.—Austin 2012, pet. ref'd).

In determining whether a defendant would not have pleaded guilty but for counsel's deficient advice, we consider the circumstances surrounding the plea and the gravity of the alleged failure material to that determination.  *Moreno*, 382 S.W.3d at 528 (citing *Ex parte Moody*, 991 S.W.2d 856, 858 (Tex. Crim. App. 1999)).

### 1. Circumstances Surrounding the Plea

In reaching its conclusion with regard to the voluntariness of Uribe's plea, the trial court listed factors developed by the Fourteenth Court of Appeals in *Murillo*.  In *Murillo*, the Fourteenth Court cited our analysis in *Moreno* in developing its list of factors.  *See* 389 S.W.3d at 930 (citing *Moreno*, 382 S.W.3d at 529).

In *Moreno*, we affirmed the denial of habeas relief with regard to a lawful permanent resident who had been indicted for two felonies—possession of between four and 200 grams of cocaine, and possession of between four and 200 grams of cocaine with intent to deliver—and who pleaded guilty to the possession charge in exchange for dismissal of the possession-with-intent-to-deliver charge; he received eight years' deferred adjudication community supervision.  382 S.W.3d at 524.  After DHS began removal proceedings based on his possession "conviction," Moreno alleged that he had received ineffective assistance of counsel when he decided to plead guilty because if he had known

13

he was certain to be deported because of his plea, he would not have pleaded guilty or would have at least instructed his trial counsel to attempt to obtain a plea bargain that would not have resulted in his automatic deportation. *Id.*

Moreno's former trial counsel stated in his affidavit that he had advised Moreno about possible immigration problems, had suggested that he seek the advice of an immigration attorney, and had given to Moreno the contact information for an immigration attorney. *Id.* at 525. To his knowledge, Moreno had never contacted the immigration lawyer. *Id.* He also stated that during plea negotiations, the State never offered to recommend a punishment less than incarceration and that at one point, the State had threatened to charge Moreno with an even greater drug possession charge. *Id.* Regarding the charge's underlying facts, he stated that the police had seen Moreno place a brown paper bag in a vehicle, which the police later discovered contained approximately 1.5 kilos of cocaine, and which the police used to obtain a search warrant for Moreno's home, where they found 60 grams of cocaine. *Id.* Moreno signed a plea document that contained substantially similar language as Uribe's: "If you are not a citizen of the United States of America, a plea of guilty or nolo contendere for this offense may result in deportation, the exclusion from admission to this country, or the denial of naturalization under federal law." *Id.* at 525 n.5. The trial court found that both trial counsel and the trial court had warned Moreno about the possible immigration consequences of his plea before he made it and concluded that Moreno had failed, among other things, to carry

14

his burden to show that he would not have pleaded guilty if his counsel had informed him of the plea's consequences. *Id.* at 525.

We determined that the record supported the trial court's findings, particularly in light of the trial court's role to make credibility determinations. *Id.* at 528. We held that the trial court could have rationally found, based on Moreno's apparent total inaction upon receiving repeated verbal and written warnings about the possibility of his deportation, that his immigration status was not his primary concern upon pleading guilty. *Id.* at 529. Additionally, based on Moreno's failure to offer any evidence showing that the State would have considered a different plea bargain without the same immigration consequences, there was little to support Moreno's assertion that if he had known that he would be deported for pleading guilty, he would have instructed his trial counsel to try the case or to attempt to obtain a different plea bargain. *Id.* (observing that there was no evidence that the State was willing to accept a plea bargain for anything other than a controlled substance charge, which, under federal law, generally leads to deportation).

### 2. The *Murillo* Factors

As cited by the trial court in its findings of fact and conclusions of law, in *Murillo*, our sister court considered several factors regarding the circumstances surrounding a defendant's plea in light of the evidence presented to the habeas court: (1) evidence of the applicant's guilt; (2) whether the applicant presented evidence of any factual or legal defenses to the charge; (3) whether the applicant

15

presented evidence indicating that the immigration consequences of her plea had been her "paramount concern"; and (4) the circumstances of the plea deal compared to the penalties the applicant risked by going to trial. *Murillo*, 389 S.W.3d at 928–31. We have not formally adopted these factors in a published opinion and now consider whether to do so.

The applicant in *Murillo*, a lawful permanent resident who pleaded guilty to the class A misdemeanor assault of his wife and received a year of deferred adjudication and a fine, filed a habeas application in which he argued that he had been denied effective assistance of counsel because his plea counsel had failed to properly apprise him that he faced presumptively mandatory deportation as a result of his guilty plea, thus rendering his plea involuntary under *Padilla*.[14] *Id.* at 924. At the habeas hearing, the applicant testified that his defense attorney had told him that he *could* be deported if he entered a guilty plea and that the trial court had given him the same warning but that neither had definitely advised him that he *would* be deported if he pleaded guilty. *Id.* at 925. The applicant claimed that if he had been advised that he would be deported, he would not have

---

[14]With regard to advice about the immigration consequences of a plea, the nature of the advice to be given is dependent on the certainty of the applicable immigration law. *Padilla*, 559 U.S. at 369, 130 S. Ct. at 1483. That is, when the relevant immigration law is "not succinct and straightforward" as to whether a plea will result in deportation, "a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences.[] But when the deportation consequence is truly clear, as it was in [Padilla's] case, the duty to give correct advice is equally clear." *Id.*, 130 S. Ct. at 1483 (footnote omitted).

16

pleaded guilty and would have insisted on going to trial. *Id.* His former defense counsel testified that the offense report, included in his case file when she advised him, indicated that the responding officer had seen the assault and heard the woman screaming. *Id.* at 927–28.

### a. Evidence of Applicant's Guilt

In the first factor, the *Murillo* court considered the strength of the State's case and evidence of the applicant's guilt. *Id.* at 928; *see Fassi*, 388 S.W.3d at 888. The court noted that the denial of habeas relief based on lack of sufficient prejudice is not an abuse of discretion when the evidence of the applicant's guilt is "overwhelming." 389 S.W.3d at 928. In developing this factor, the court reviewed *Fassi*, one of its earlier cases. *Id.* In *Fassi*, the eighteen-year-old resident alien was charged with possessing 2 ounces or less of marijuana, a Class B misdemeanor for which he faced up to six months' confinement and a $2,000 fine and for which he actually received—pursuant to a plea bargain—six months' deferred adjudication community supervision and a $150 fine. 388 S.W.3d at 883. He subsequently complained that his counsel had not discussed with him his plea's immigration consequences. *Id.* at 884. The State responded with affidavits from Fassi's trial counsel and the arresting officer, and the court held a hearing in which Fassi, trial counsel, and Fassi's immigration attorney testified. *Id.*

In its findings, the trial court stated that counsel had advised Fassi about potential negative immigration consequences and also that there was a waiver of

deportation available in cases in which a defendant was convicted of a *single* offense of possession of marijuana under 30 grams. *Id.* Fassi did not tell his counsel that he had previously been convicted of possession of drug paraphernalia. *Id.* Fassi made no showing that he ever questioned his attorney at the time of the plea regarding any factors that might limit his deportation consequences and presented no evidence that any alternative plea bargain was available in his case that would have allowed him to avoid negative immigration consequences. *Id.* The officer's affidavit, found credible, reflected that when he stopped Fassi for a traffic violation, Fassi smelled of marijuana, had flakes of it on his shirt, and confessed to possessing marijuana. *Id.* at 884–85. The trial court concluded that, in light of the overwhelming evidence of Fassi's guilt, the fact that Fassi did not allege or prove that any other plea bargain was available that would have allowed him to avoid potentially negative immigration consequences, and his failure to show any legal or factual defense to the charged offense, Fassi failed to show that it would have been rational for him to reject the plea bargain and proceed to trial. *Id.* at 885. Thus, Fassi showed no prejudice. *Id.*

Our sister court affirmed the trial court's judgment, stating,

> The habeas court considered the "overwhelming" evidence of appellant's guilt, the fact that he faced up to six months' confinement and a $2,000 fine if convicted, the lack of evidence of any factual or legal defenses, and the lack of evidence that any other plea deal would have helped him avoid deportation. These factors suggest that a rational noncitizen defendant would likely not risk a trial if the result is near-certain conviction—under those circumstances, the

18

> defendant faces a harsher criminal penalty in addition to the same immigration consequences of pleading guilty. . . .
>
> . . . .
>
> Further, although the *Padilla* Court recognized that deportation consequences are 'sometimes the most important part' of the penalty that may be imposed on noncitizens who plead guilty, this record contains no evidence indicating that immigration consequences were appellant's paramount concern. . . . there is no evidence appellant expressed his concerns about deportation to the trial court, plea counsel, or anyone else at the time of his plea.

*Id.* at 888–89.

With regard to evidence of the applicant's guilt and comparing the plea deal to the penalties risked at trial, the *Murillo* court also reviewed *Ali*, 368 S.W.3d at 840. *Murillo*, 389 S.W.3d at 928, 930. Ali, an alien, pleaded guilty to a drug paraphernalia offense and received a suspended 180-day sentence and twelve months of community supervision. *Ali*, 368 S.W.3d at 829. In the subsequent habeas proceeding, the evidence before the court consisted of the affidavits of Ali, his trial counsel, and a person who had been charged with a similar offense and had been represented by the same counsel. *Id.* at 830, 832. Ali claimed in his affidavit that he had told his counsel that he had a pending application for permanent residency and that it was important that he not be deported. *Id.* at 836. He claimed that his counsel never recommended to him that he should contact an experienced immigration lawyer to help with his case but instead advised him that if he accepted the plea offer, he would not face any immigration problems. *Id.* Ali also claimed that he would not have pleaded guilty

if he had known the immigration consequences because it would work a hardship on his parents and his two younger brothers, who were legal permanent residents, if he were removed. *Id.*

Ali's trial counsel stated in his affidavit that although he was very familiar with his foreign clients' immigration issues, he did not practice immigration law and that he always told his clients to seek advice from immigration lawyers on their immigration issues. *Id.* at 837. He stated that the State's evidence, which he had discussed with Ali, included the undercover officer's audio and video recordings of the transaction that led to the criminal charge, that Ali had acknowledged that the evidence against him was overwhelming, and that it was virtually certain that a jury would not believe his innocence. *Id.* at 837–38. He stated that after viewing the videotape, Ali told him that he went to see his immigration attorney. *Id.* at 838. He further opined that if Ali had gone to trial and been convicted, he would have risked the same deportation consequences but could also have been sentenced to up to a full year of actual jail time. *Id.* at 840. The other client's affidavit stated that he had reviewed the evidence with Ali and their trial counsel and that "[w]hile the case against [him] was weak, it was obvious to [him] that the evidence against [Ali] was very strong," and he corroborated that Ali's counsel had informed them about the immigration problems they would have for any type of criminal conviction and suggested that they should seek advice from their immigration attorneys. *Id.* at 839.

The trial court found that Ali's counsel's affidavit was a credible, reliable, and accurate depiction of the events that had occurred, that the other client's affidavit corroborated those events, and that it specifically disbelieved the allegations in Ali's affidavit regarding counsel's failure to communicate the possibility of immigration consequences as a result of the plea. *Id.* The trial court also noted that Ali had twice entered a guilty plea and, in light of the benefits Ali had obtained by virtue of his plea bargain, that he had failed to show that but for counsel's perceived ineffectiveness, he would have insisted on a jury trial. *Id.* at 838–39. The Austin court concluded that the trial court would not have abused its discretion by disbelieving Ali's sworn affidavit testimony that he would have insisted on going to trial, and without credible evidence that Ali would have insisted on trial had counsel advised him he would be deported if he entered a guilty plea, it could not conclude that Ali had met his burden under *Strickland*'s prejudice prong. *Id.* at 840–41.

The *Murillo* court then distinguished cases in which the State presented no rebuttal evidence as to the strength of its case or in which circumstances indicated that the applicant had a defense to the charge. *Murillo*, 389 S.W.3d at 928–29 & n.2 (recognizing that the court had rejected the San Antonio and Houston-First courts' approach of accepting as true an applicant's affidavit statements without undertaking an analysis of whether the decision to reject a plea bargain and instead go to trial was rational under the circumstances).

21

### b. Evidence of Defenses to the Charged Offense

In the second factor, the *Murillo* court identified defenses to the charged offense as contributing to the determination of whether rejecting a plea bargain would be rational. *Id.* at 929. It provided examples of situations in which an applicant might claim lack of criminal intent, i.e., when he thought taking an item was just a prank and that his friend intended to return it or when an applicant who was charged with assaulting a police officer did not know that the person who had approached him from behind was a police officer.[15] *Id.*

### c. Consequences as "Paramount Concern"

In the third factor, the *Murillo* court identified circumstances in which the applicant either did or did not present evidence that the immigration consequences of his plea had been his "paramount concern." Referring back to *Fassi* and citing *Moreno*, *Murillo* specifically examined whether the applicant presented evidence that he had expressed his concern about deportation to the trial court, plea counsel, or anyone else at the time of his plea or if he presented other evidence tending to support that immigration consequences had been his primary concern at that time. *Murillo*, 389 S.W.3d at 929–31 (citing *Moreno*, 382

---

[15]Along with *Fassi*, the court reviewed *Salazar v. State*, 361 S.W.3d 99, 103 (Tex. App.—Eastland 2011, no pet.) (prank), and *Ex parte Olvera*, 394 S.W.3d 572, 576–77 (Tex. App.—Dallas 2012) (noting that the officer testified that when arrested, Olvera said "I didn't know you were the police"), *rev'd on other grounds*, No. PD-1215-12, 2013 WL 1149926, at *1 (Tex. Crim. App. Mar. 20, 2013), in considering evidence of the applicant's factual or legal defenses. *Murillo*, 389 S.W.3d at 929.

S.W.3d at 529). The *Murillo* court also reviewed *Ex parte Elizondo-Vasquez*, a case involving a second-degree felony marijuana possession charge that was plea-bargained for a twelve-year sentence. *Id.* at 929–30 (discussing *Ex parte Elizondo-Vasquez*, 361 S.W.3d 120, 121, 122–23 (Tex. App.—Texarkana 2011, no pet.)). In *Elizondo-Vasquez*, the appellant argued that his trial counsel had not advised him that his guilty plea *would* (not just could) result in his deportation. 361 S.W.3d at 121. At the hearing on his motion for new trial, the appellant's trial counsel confirmed that the appellant's primary concern had been how the charge and any resulting incarceration would impact his immigration status. *Id.* Counsel testified that he never gave the appellant a definitive answer regarding his status and, rather than conducting the legal research that would have revealed that deportation is mandatory upon conviction for possession of a large quantity of marijuana, that he had advised the appellant to consult an immigration lawyer. *Id.* On these facts, the court held that due to counsel's ineffective assistance, the appellant's guilty plea was involuntary, and it reversed the conviction and remanded the case to the trial court. *Id.* at 123.

### d. Risk Assessment of Plea Deal versus Trial Penalties

Finally, in the fourth factor, the *Murillo* court observed that while the inquiry is not whether the applicant would have received a more favorable disposition at trial, a reviewing court could properly consider evidence concerning the likelihood of success at trial when determining whether it would be rational to reject a plea bargain. 389 S.W.3d at 930. Additionally, *Murillo* held that a reviewing court

23

could consider whether the applicant presented evidence that any other plea deal would have helped him avoid negative immigration consequences, as well as whether the applicant presented evidence regarding the likelihood of obtaining probation if convicted at trial. *Id.* The court considered *Fassi*, *Ali*, and our analysis in *Moreno* in developing this factor. *Id.* at 930–31.

The *Murillo* court indicated that the factor test should apply when, as here, the record is more than "marginally developed regarding the alleged prejudice." *See id.* at 928 (referencing *Aguilar v. State*, 375 S.W.3d 518, 526 (Tex. App.— Houston [14th Dist.] 2012), *rev'd on other grounds*, 393 S.W.3d 787, 788 (Tex. Crim. App. 2013)).[16] We conclude that the factors that the *Murillo* court derived from case law present a helpful, nonexclusive list of considerations to facilitate the determination of whether a guilty plea is involuntary in light of sufficient evidence presented to a habeas court to support such a determination, and we hereby adopt the factors.[17]

---

[16]In *Aguilar*, the applicant did not provide live testimony or any specific evidence regarding the rationality of rejecting a plea bargain under the circumstances, apparently relying solely on his stance, as expressed in his affidavit, that he would have rejected the plea because residence in the United States was of paramount importance to him. *Aguilar*, 375 S.W.3d at 526. In contrast, here, although Uribe did not provide live testimony, she presented a detailed affidavit and the State rebutted her affidavit with substantial controverting evidence.

[17]This factor test is nonexclusive and some of the factors may not fit in every circumstance. For example, a "conviction" that can make an alien deportable under the immigration and nationality act includes deferred adjudication, so the availability of probation may be irrelevant in some cases. *See* 8 U.S.C.A. § 1101(a)(48)(A)(i)–(ii) (West 2005) (stating that "conviction"

## B. Application

In the trial court, Uribe argued that "because she spent over 180 days in jail," she was precluded from establishing the good moral character necessary to be eligible for cancellation of removal. *See* 8 U.S.C.A. § 1101(f)(7), 1229b(b)(1). She referred the trial court to her former immigration attorney's affidavit stating that he did not tell Uribe's criminal defense attorney that confinement for more than 180 days as a result of a conviction would proscribe her ability to show that she was a person of good moral character under § 1101(f)(7),[18] claiming that she would have proceeded to trial if she had known the true consequences of her plea.

The State responded that even if Uribe's counsel had been constitutionally deficient in his representation, Uribe had failed to show that there was a reasonable probability that, but for his errors, she would not have pleaded guilty. The State argues that it would not have been rational for her to proceed to trial— and face an even harsher penalty with the same immigration consequences—

---

means a formal judgment of the alien's guilt entered by a court or, if adjudication of guilt has been withheld, a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt and the judge has ordered the imposition of some form of punishment, penalty, or restraint on the alien's liberty); *Murillo*, 389 S.W.3d at 924 (observing that Murillo pleaded guilty to misdemeanor assault, received one year of deferred adjudication and a fine as punishment, and was ordered deported "based on his conviction for assault of a family member").

[18]Because we resolve this issue on the prejudice prong, we will not address deficiency of counsel. *See Murillo*, 389 S.W.3d at 927.

25

instead of pleading guilty for a shorter sentence. Referencing the evidence attached to its response, including Uribe's signed written statement, which, according to the State showed that she had committed aggravated assault with a deadly weapon, the State points out that "had she proceeded to trial it is likely she would have been found guilty" and sentenced to up to twenty years in prison instead of only 270 days.[19] The State also relies upon Uribe's affidavit, which

---

[19]As set out above, 8 U.S.C. § 1229b(b) requires that, in addition to good moral character, the alien not be convicted of an offense under §§ 1182(a)(2), 1227(a)(2), or 1227(a)(3). 8 U.S.C.A. § 1229b(b). 8 U.S.C. § 1227(a) lists criminal offenses that make an alien deportable, including offenses classified as "aggravated felon[ies]." *Id.* § 1227(a)(2)(A)(iii) (West 2005). 8 U.S.C. § 1101(f)(8) provides that no person shall be regarded as or found to be a person of good moral character if, during the time period for which good moral character is required to be established, he or she is or was "one who at any time has been convicted of an aggravated felony (as defined in subsection (a)(43) of this section)." *Id.* § 1101(f)(8) (West 2005 & Supp. 2016). "Aggravated felony" is defined as, among other things, a "crime of violence (as defined in section 16 of Title 18 . . .) for which the term of imprisonment [is] at least one year" and which applies to an offense in violation of either state or federal law. *Id.* § 1101(a)(43)(F) (West 2005 & Supp. 2016). Section 16 of Title 18 defines "crime of violence" to mean either an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another or "any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C.A. § 16 (West 2015). As set out above, Uribe's offense, as alleged in the indictment, was for aggravated assault with a deadly weapon, a second-degree felony with a punishment range of two to twenty years' confinement.

8 U.S.C. § 1227(a) also lists conviction of a crime involving moral turpitude committed within 5 years after the date of admission for which a sentence of one year or longer may be imposed as resulting in deportability, 8 U.S.C.A. § 1227(a)(2)(A)(i), and misdemeanor assault *can* be, but is not necessarily, considered a crime involving moral turpitude. *See, e.g.*, *Guerra v. State*, No. 01-15-00650-CR, 2016 WL 6212999, at *10 (Tex. App.—Houston [1st Dist.] Oct. 25, 2016, no pet.) (mem. op., not designated for publication) (listing cases that have

26

fails to assert that immigration consequences were her primary concern in 2009 when she was facing up to twenty years' confinement.

The trial court here made explicit findings and conclusions on reasonable grounds concerning Uribe's failure to prove prejudice. The court's rulings are supported by the evidence of Uribe's guilt not just of a lesser-included offense but also the greater aggravated-assault-with-a-deadly-weapon charge, for which she faced a sentence of up to twenty years and for which, if she were convicted, would have also resulted in her deportability. Additionally, the trial court was entitled to disbelieve Uribe's self-defense claims in her affidavit. And, as in *Moreno*, the record here does not reflect that the State would have been willing to accept a plea bargain for a different offense or to further negotiate for a plea that would have fewer negative immigration consequences. *See* 382 S.W.3d at 529–30. Even though Uribe or her criminal defense counsel consulted outside immigration counsel, which constitutes some evidence that her plea's immigration consequences were of some concern to Uribe, we cannot conclude on this record that the trial court lacked the authority or a reasonable basis under the facts of this case to make the judgment call that Uribe had failed to prove by

---

held that assault-family violence is a crime involving moral turpitude but specifically identifying the ones involving male-on-female violence); *see also Lazaro v. Holder*, 390 Fed. App'x. 319, 321 (5th Cir. 2010) (stating that Texas's penal code section 22.01, which criminalizes assault, "encompasses acts that both are and are not crimes of moral turpitude," requiring a review of the record of conviction to determine the offense's status), *cert. denied*, 562 U.S. 1153 (2011). Uribe's plea bargain included a waiver of a family violence finding.

a preponderance of the evidence that she would not have pleaded guilty but for her former immigration counsel's advice.

Because the trial court's findings and conclusions are supported by the record, we must defer to those rulings. *See id.* at 530. Therefore, we conclude that the trial court did not abuse its discretion by denying the relief requested in Uribe's application for a writ of habeas corpus, and we overrule her sole issue as it was presented in the trial court.

## IV. Conclusion

Having overruled Uribe's sole issue presented in the trial court, we affirm the trial court's judgment denying Uribe's application for writ of habeas corpus.

/s/ Bonnie Sudderth
BONNIE SUDDERTH
JUSTICE

PANEL: LIVINGSTON, C.J.; WALKER AND SUDDERTH, JJ.

WALKER, J., concurs without opinion.

PUBLISH

DELIVERED: March 9, 2017

28