

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-17-00280-CR

**EX PARTE** Miguel **MARTINEZ**

From the 437th Judicial District Court, Bexar County, Texas
Trial Court No. 2015CR4203
Honorable W.C. Kirkendall, Judge Presiding[1]

Opinion by:   Marialyn Barnard, Justice
Dissenting Opinion by: Rebeca C. Martinez, Justice

Sitting:      Marialyn Barnard, Justice
              Rebeca C. Martinez, Justice
              Irene Rios, Justice

Delivered and Filed:  July 31, 2018

AFFIRMED

This is an appeal from the habeas court's order denying appellant Miguel Martinez's application for writ of habeas corpus.  On appeal, Martinez contends the habeas court erred in denying his application because double jeopardy bars any attempt by the State to retry him for murder following the trial court's grant of a mistrial.  We affirm the trial court's order.

---

[1] The Honorable Lori Valenzuela is the presiding judge of the 437th District Court, Bexar County Texas.  The Honorable W.C. Kirkendall, retired, was sitting by assignment.  Judge Kirkendall signed the order at issue in this matter.

**BACKGROUND**

*Investigation, Pre-Indictment, Indictment Phases*

On January 11, 2015, San Antonio police were dispatched to a scene following a report of "possible shots fired." Upon arrival, authorities found Laura Carter sitting in the driver's seat of her vehicle, a Honda Accord. She was sitting in the front seat with her hands in her pockets and her feet crossed. She was pronounced dead at the scene. It was later determined Carter died as a result of multiple gunshots to the head.

As a result of their investigation, law enforcement officials came to believe the murder had been committed by Martinez. Ultimately, authorities arrested Martinez for Carter's murder. Law enforcement authorities continued the murder investigation after Martinez's arrest. In March 2015, law enforcement completed the "prosecution guide," which was approximately fifty pages in length. The prosecution guide is prepared in its entirety by law enforcement; no part of the guide is prepared by the District Attorney's Office. The guide generally includes initial offense reports, witness statements, discs of interviews, etc. It is used by prosecutors "to figure out the nuts and bolts of the case."

The prosecution guide was turned over to Jason Goss, first-chair prosecutor in the 437th District Court, which had been assigned to handle the case. Goss testified that around the end of the work day on March 8, 2015, he gave the prosecution guide to the second-chair prosecutor in the 437th District Court to review. According to Goss, she was to review the guide to assist him in preparation for presenting the case to the grand jury. Goss did not believe she took the guide home with her, stating, "It would be unusual for her to do that." The next morning — sometime before 9:15 a.m. — the second-chair prosecutor returned the guide to Goss, informing him that she had read the guide and did not believe she could continue on the case. When Goss queried her as to why, she advised she had a "one-night stand" or "one-time sexual encounter" three years earlier

with Gregory Dalton, who was listed in the prosecution guide as a witness. The second-chair prosecutor told Goss she did not even know the man's real name, but recognized him from his photograph and nickname, Vegas. Goss asked whether she had any contact with Dalton since the initial encounter and she said, "no, it was one night."

Goss agreed and immediately removed her from the case, replacing her with the third-chair prosecutor. He instructed her to have nothing further to do with the case — specifically explaining she was not permitted to communicate with anyone about the case. She stated she understood. At her request, Goss agreed to avoid disclosing the details of her removal if possible.

Goss subsequently explained to the habeas court that he believed the second-chair prosecutor had a "conflict" that precluded her further participation in the matter. As a result of the "conflict," Goss removed her from the case, then went to the court advocate and without explaining the details, advised the advocate that the second-chair prosecutor was conflicted out of the case and there was to be no communication with her about it. Goss stated he constructed a "firewall" in the office to prevent the second-chair prosecutor from having anything to do with the case. Goss believed this action "ended" the matter and he did not think about it again. He explained he had the file the entire time and the second-chair prosecutor "didn't have anything to do with this case."

When asked what he felt the conflict was, Goss replied that he had come from a smaller county in which it seemed as if someone in the prosecutor's office always seemed to know a defendant or witness. In his former office, they would simply remove the conflicted person and wall them off from the matter. Goss admitted he would not want someone who knew a witness — like the second-chair prosecutor — questioning him or her because it might affect his or her objectivity. They might react favorably or unfavorably with the witness, and the existence of a personal relationship might have the appearance of impropriety. However, Goss specifically testified that at the time of the disclosure, he "knew that what she had told me was not — was not

exculpatory, mitigating or relevant so — as far as — as far as to the facts of this case or to trying this case." Thus, he "felt like the issue had been dealt with on my level as the supervisor." Goss never spoke to the second-chair prosecutor again about the matter.

Goss, with the assistance of the third-chair prosecutor, presented the matter to the grand jury. On April 14, 2015, the grand jury indicted Martinez for the murder of Carter.

### *Pre-Trial Phase*

In preparation for Martinez's February 7, 2017 trial, Goss and District Attorney Nicholas LaHood interviewed Gregory Dalton on January 31, 2017. During the interview, Dalton revealed additional information he had not previously disclosed to law enforcement. The revelations by Dalton prompted Goss to prepare an amended *Brady* notice in response to a motion previously filed by Martinez and granted by the trial court requesting disclosure of materials within the purview of *Brady v. Maryland. See* 373 U.S. 83 (1963). In the amended notice, which was emailed to the defense on February 1, 2017, Goss fully disclosed the new information provided by Dalton. Goss explained at the habeas hearing that he filed the amended *Brady* notice because the information revealed by Dalton during the interview showed his willingness to participate in a sexual assault of the victim and in her subsequent murder. Goss stated this information fell within the confines of *Brady* because it could be used to impeach Dalton's credibility as a witness.

Goss did not disclose any information about the prior encounter between Dalton and the second-chair prosecutor. He explained he did not believe the "one-time sexual encounter" between the second-chair prosecutor and Dalton fell within the disclosure mandates of *Brady*. Goss maintained that position during the habeas hearing. However, Goss admitted he was sufficiently concerned to bring others from the District Attorney's Office into the loop. Goss explained that he "kind of [got] an idea of what the defensive theory might be" with regard to Dalton and his encounter with the second-chair prosecutor. Accordingly, Goss disclosed the encounter between

the second-chair prosecutor and Dalton to LaHood. Goss testified at the habeas hearing that LaHood's initial reaction was the same as his — this was not mitigating, exculpatory, or impeachment evidence that needed to be disclosed to the defense.

LaHood contacted the chief of the appellate division, Enrico Valdez, that same evening. According to LaHood, Valdez advised that it did not seem "like information that needs to be disclosed," but he wanted an opportunity to research the issue and speak to Patrick Ballantyne, chief of the office's Ethical Disclosure Unit. A couple of days later — on February 2 or 3, 2017, Valdez informed LaHood that he and Ballantyne had researched the issue and believed the encounter between the second-chair prosecutor and Dalton "was not information that was required to be disclosed and that we did not have to disclose it." They suggested, however, that if Goss and LaHood wanted to take additional action with regard to the issue — "in an abundance of caution" — they might consider disclosing to the trial court in camera. LaHood could not remember if he spoke to Goss about what he learned from Valdez, but he assumed Goss was speaking to Valdez and Ballantyne too. He did not ask Goss to make an in camera disclosure to the trial court. LaHood stated he was not concerned about providing the information to Goss because "it wasn't like we thought this was a — you know, a critical point for the — for the trial."

On February 7, 2017, during pretrial motions just prior to voir dire, Goss signed a discovery acknowledgment pursuant to article 39.14(i) of the Texas Code of Criminal Procedure. Article 39.14(i) requires the State to "electronically record or otherwise document any document, item, or other information provided to the defendant" during discovery. TEX. CODE CRIM. PROC. ANN. art. 39.14(i) (West Supp. 2017). As Martinez points out, there was nothing in the disclosure about the one-time encounter between the second-chair prosecutor and Dalton, thereby establishing the State had not disclosed to the defense information regarding the encounter. Under article 39.14(i), the acknowledgment is merely a statement of what was provided by the State during discovery. As

the one-time encounter had not been disclosed, it would not have been listed in the article 39.14(i) acknowledgment.

### *Trial Phase — Multiple In-Chambers Hearings*

The parties began voir dire on the scheduled trial date — February 7, 2017. A jury was selected, but not sworn. Proceedings were recessed and the jury left, instructed to return the next day. The next morning, before the jury was sworn, Goss filed a "Motion for Ex Parte Communication and In Camera Consideration of Potential Conflict Issue." The motion was presented to the trial court and a copy provided to Martinez's defense counsel. The trial court met in chambers with Goss. The only other person present was the court reporter, who recorded the proceedings.

Goss informed the trial court about the second-chair prosecutor's 2015 disclosure. In his conversation with the trial judge, the Honorable Lori Valenzuela, Goss used the second-chair prosecutor's name.[2] Goss described his actions — immediately removing the second-chair prosecutor and constructing a firewall "between her and the case." Goss advised the trial court that from that point forward, the second-chair prosecutor had nothing to do with the case. He stated he kept the file and no one spoke to her about the case. He assigned the task of assisting him with the case to the third-chair prosecutor. Goss told the trial court it was the third-chair prosecutor who helped him prepare for the grand jury.

Goss then described Dalton's role as a State's witness and his possible testimony. Goss then explained that the purpose of bringing the matter to the trial court's attention at this time was the possibility — raised by Ballantyne — that the defense might use the encounter between Dalton and the second-chair prosecutor to impeach Dalton. As Goss put it, the defense "could say you're

---

[2] Given that the second-chair prosecutor was assigned at the time of the disclosure to Judge Valenzuela's court, concealing her name was obviously unnecessary — Judge Valenzuela would know the prosecutors in her court.

testifying to this is [sic] because of the sexual relationship you had with one of the prosecutors." Goss believed the impeachment value of the encounter was "weak" given that to his knowledge the second-chair prosecutor and Dalton had not had any contact after that one encounter in 2011 or 2012. Goss testified at the habeas hearing that when the second-chair prosecutor first disclosed her encounter with Dalton, he asked her if she had any contact with him after that one night. According to Goss, she said "no, it was one night." Goss then noted that during his three-hour interview with Dalton, Dalton never mentioned the second-chair prosecutor.

Despite his belief that the information had little impeachment value, Goss advised the trial court that out of "an abundance of caution," the State wanted to make the court aware of the situation and have the court decide whether the one-time encounter should be disclosed. Goss then again expressed his belief that the information "would be of no value … to the defense," but disclosure could damage the second-chair prosecutor's reputation.

After Goss completed his statements, the trial court first asked whether the second-chair prosecutor "[did] the intake?" Goss told the trial court the second-chair prosecutor did not do the intake. The trial court then asked if there were any "agreements" with Dalton with regard to his testimony. Goss advised there were not. Goss explained it was understood that after Dalton came forward and his story matched the evidence — and the District Attorney's Office found it credible, he would not be charged with murder. Goss stated "there's never been a threat of a charge or an agreement not to charge." The trial court stated it did not believe that "the extent of their relationship" should be disclosed at this point. However, the court pointed out that during voir dire, the attorneys discussed accomplices and the law of parties, suggesting that the defense could point the finger at Dalton "as being some kind of party to this, an accomplice to this, the getaway driver[,]" making him more of a star witness than he might otherwise be. Goss agreed, stating they talked about the law of parties during voir dire because that the defense might point to Dalton

as the actual murderer given that: (1) he picked up Martinez near the murder scene; (2) a van like his was seen near the site of the murder; (3) his phone was near the scene; and (4) he had information about the murder that he could have known only if he committed the murder, was present at the murder, or was told about the murder by the perpetrator.

The trial court then stated it saw the matter as involving two discrete issues — one, whether the State should disclose the information, and two, whether the disclosure is admissible for purposes of impeachment. As to whether the State should disclose the existence of the one-time encounter, the trial court opined that "the disclosure may be necessary," but it would have to hear the testimony before deciding whether it was admissible for impeachment or any other purpose. The trial court expressed her concern for the second-chair prosecutor and her reputation, agreeing the matter had the potential to be much bigger than it was. Accordingly, the court agreed to "contemplate some remedies" to diminish potential harm to the second-chair prosecutor.

The trial judge then stated that, "My gut right now is that I would want it disclosed." Goss then asked that if he was being ordered to disclose the information to the defense, whether it should be disclosed before opening statements or just before Dalton takes the stand. The trial judge then stated:

> This is — this is not — I mean if I say disclose, you need to disclose, and you decide when you do it.
>
> But this is just my opinion for whatever it's worth … if this is information you've had since 2014 … [o]kay 2015 … I wouldn't put yourself — that's my — I'm just giving you my advice … I wouldn't wait any longer ….

In response, Goss stated his concern about disclosing the information before the trial court had an opportunity to devise a remedy to reduce the effects to the reputation of the second-chair prosecutor. The trial judge responded by indicating that Goss should withhold the name of the second-chair prosecutor to give her time to consider a possible remedy. She then stated she would

take "the responsibility for the delay in disclosure," advising she would "say I told you that I thought the disclosure was appropriate but to hold off so that I could make sure that I had an appropriate remedy." Judge Valenzuela subsequently explained at the habeas hearing that she meant she would take the responsibility for any delay in the disclosure of the second-chair prosecutor's name, but not any decision by Goss to delay disclosure about the encounter between Dalton and the second-chair prosecutor. The record does not show that at any time during the hearing the trial court *ordered* Goss to disclose to the defense the encounter between Dalton and the second-chair prosecutor. Rather, the trial judge's strongest statement during the entire ex parte hearing was "I mean if I say disclose, you need to disclose[.]" In fact, at the habeas hearing, Judge Valenzuela admitted she did not order Goss to do anything at that time, agreeing that she left it up to Goss to do whatever he wanted to do at that point.

Despite the absence of an actual order by the trial court, after the ex parte hearing, Goss disclosed the "one-time sexual encounter" to the defense, withholding the name and position of the prosecutor.[3] He also did not disclose that the prosecutor in question had reviewed the prosecution guide prior to indictment. In essence, he told one of Martinez's defense attorneys, Christian Henricksen, that in early 2015, a female prosecutor had informed him that she had a "one-night stand" with Dalton several years prior to the murder. Goss further advised that he would provide the name of the prosecutor once the trial court found a "remedy" with regard to protection of the prosecutor. Henricksen testified at the habeas hearing he was "not then overly

---

[3] Goss's decision to withhold the position of the prosecutor in addition to her name was logical. Martinez's defense attorneys are long-time Bexar County advocates. If Goss had advised them that "the second-chair prosecutor in the 437th District Court" disclosed to him in 2015 that she had an encounter with Dalton, the defense attorneys would surely have known — or could have easily discovered — the name of the prosecutor to whom Goss was referring, thereby negating any effect of withholding her name as mandated by Judge Valenzuela.

concerned" by the disclosure. Henricksen passed the information to his co-counsel, Joe Gonzales, who testified he was focused on the trial at that point.

After the disclosure, the jurors were sworn and trial began. Goss made an opening statement during which, among other things, he described the testimony he expected Dalton would provide; the defense reserved its opening statement. The State then called its first witness, L.C., who was fourteen at the time of the murder. L.C. essentially testified that on the evening of the murder, he was inside when he heard his dog barking. He went outside to feed the dog and saw a Honda Accord pull up and stop under a street light in front of the empty house next door. L.C. testified he saw a Hispanic male in a dark hoodie get out of the passenger side of the car. The male was "messing with his pockets" as if he was removing something. L.C. went back inside and just a couple of minutes later heard "six gunshots go off." L.C.'s grandmother called 911 as he looked outside. After police arrived, L.C. told them he had seen a white Dodge van driving away from the Honda Accord a few minutes after the shooting. After the State's direct examination of the first witness, court recessed for lunch.

After lunch, the trial continued. At the habeas hearing, Judge Valenzuela testified that at some point that afternoon, an off-the-record conference was held in her chambers. Present at the conference were the judge, Goss, LaHood, and both defense attorneys. During the conference, according to Judge Valenzuela, she asked Goss if he had "told them everything." When Goss advised that he had not, Judge Valenzuela, for the first time, ordered Goss "[t]ell them now everything." [sic] Goss immediately disclosed the remaining details to the defense — the name of the prosecutor who had the encounter with Dalton, her position as second-chair prosecutor in the 437th District Court, and that she had reviewed the prosecution guide prior to indictment, which prompted her disclosure to Goss. Goss's remembrance of events was somewhat different. He testified that at this conference the trial court stated she was aware that Goss had told the defense

"some parts of what we talked about," but had not disclosed the name at the judge's direction. She then stated she had devised a remedy and would like for Goss to now disclose the name of the prosecutor. Goss then made the disclosure.

According to Henricksen, he was upset because the details made the encounter between the prosecutor and Dalton "a completely different thing." The defense was angry, believing Goss was "wrong" to withhold the information until after the jury was sworn and evidence was presented. Nevertheless, after the conference, the parties went back to the courtroom and trial resumed. The State called two additional witnesses, L.C.'s grandmother and the first responding officer.

L.C.'s grandmother confirmed L.C.'s statements about the barking dog and subsequent gunshots. She agreed that as her grandson looked outside, she called 911. The first responding officer from the San Antonio Police Department, Michael Wehe, testified that when he arrived he saw the Honda Accord with its passenger door open — the vehicle was running and the lights were on. Officer Wehe and his cover officer approached the vehicle and discovered a woman in the driver's seat. Officer Wehe testified she was slumped "over to her side, hands in her pockets, not moving." He noted her legs were crossed, making it appear she was relaxed before she was shot. The officer contacted dispatch, advising there was a "female down." Officer Wehe believed she had been shot, but could not determine how many times.

At the conclusion of Officer Wehe's testimony, court was recessed for the evening. As to the first day of trial, LaHood testified at the habeas hearing that he believed it was going well for the State. Goss echoed those feelings.

That evening, Henricksen sent a text to the trial court, Goss, and LaHood. Therein, he expressed his concerns over the disclosure made by Goss earlier that day. He advised the defense planned to move for a one-day continuance to give the attorneys time to consider the matter. The

State agreed to the continuance and the trial court indicated its intent to grant it. On the morning of February 9, 2017, as previously indicated, the defense filed a motion for continuance. In that motion, the defense stated a continuance was necessary because after the jury was seated, the State disclosed "critical and sensitive information that is material to the defensive theory in this case." The State did not oppose the motion. The trial court granted the defense a continuance to February 14, 2017. Immediately thereafter, the attorneys and the trial court held an in-chambers, on-the-record, conference.

During this conference, defense counsel was permitted to express their concerns about the recent disclosure. They expressed the difficulty of the situation and the need to investigate the matter and speak to an appellate attorney.

Judge Valenzuela noted that once the second-chair prosecutor's name had been disclosed to the defense, she had instructed the defense and the State that she "did not want the person named in the disclosure to be disclosed beyond the people that needed to know[,]" i.e., an investigator for the defense. She also noted she told the prosecutors she did not want them telling the second-chair prosecutor that she was likely to be questioned about her encounter with Dalton. Rather, she instructed them to tell Ballantyne to tell the second-chair prosecutor "to anticipate that there would be some questions asked of her." The judge noted she "shouldn't be in this position" and that it was not her responsibility or problem. However, she advised that "everybody needs to use their best discretion," but she would not make decisions that could "hurt the defendant." To that end, she stated she was lifting "the gag order" that she had imposed the day before, stating that if the defense felt like disclosure of the prosecutor's name was necessary, that would be their decision. She emphasized that the second-chair prosecutor did nothing wrong, disclosing her connection to Dalton "the moment she knew this information[.]"

The trial court also noted — as it had during the ex parte meeting with Goss — that although the encounter was discoverable, its ultimate admissibility was a different issue. Judge Valenzuela opined that even if the second-chair prosecutor had no influence in the case, the defense could assert a defensive theory in which Dalton was the actual perpetrator, and his encounter with the prosecutor could be fodder for impeachment based on bias or motive for testifying.

Defense attorney Gonzales advised that he considered the second-chair prosecutor "a friend and colleague" and would be respectful with how the defense proceeded. However, he could make no promises until the matter was fully investigated — the timing and chronology of events, whether the prosecutor had any part in the intake of the file, or had any influence on whether or not Dalton "was ever considered for indictment as a party to an offense." Gonzales asserted this would directly impact the defense's theory of the case, asserting that Dalton "smells like a codefendant." The defense attorneys explained their concern was not really about the second-chair prosecutor, but Dalton's potential feelings toward her that might have prompted him to "do what [he] can to help" the State.

Goss had previously denied the second-chair prosecutor had any part in the intake or any influence after she reviewed the prosecution guide and disclosed her encounter with Dalton. He subsequently reiterated this during the conference and then later at the habeas hearing. Goss further stated "for the record, so the Court knows, there was never a murder case that came in on Gregory Dalton." Gonzales stated the defense was not questioning the second-chair prosecutor's actions; rather, it was questioning Goss's decision not to disclose the encounter "in the timely fashion."

Goss stated, as he had before, that it was only after Dalton expounded on his previous statement the week before trial that he began to see a possible defensive theory based on impeachment due to the encounter between Dalton and the prosecutor. When he did, he took

action, discussing possible disclosure with his colleagues and then requesting the ex parte hearing with the trial court. Goss advised that even the appellate chief — Valdez — and the disclosure integrity chief — Ballantyne — did not believe disclosure was necessary. The ex parte meeting with Judge Valenzuela was merely a suggestion in the event Goss felt it was necessary "out of an abundance of caution."

Goss also explained the intake process to the defense, noting as he had before that the second-chair prosecutor played no part in it. Rather, her only role was her review of the prosecution guide during which she discovered Dalton was a witness. After that, she was "firewalled" from the matter. Goss also stated it was and always had been the State's position that the defense had "to do everything [it] can for [the] client." To that end, Goss reiterated the State would provide any records concerning the second-chair prosecutor's assignments during her tenure in the office, and make anyone available for an interview, as well as for testifying. Goss again stated it was simply his desire "not to impugn [the prosecutor's] reputation unneed — needlessly."

Toward the end of the hearing, the parties discussed defense interviews with Dalton and the second-chair prosecutor, appointment of an investigator, and appointment of appellate counsel to assist the defense. The trial court agreed to appoint both an investigator and an appellate attorney. Ultimately, the trial court appointed James McKay as investigator for the defense and Mark Stevens as appellate counsel for the defense.

Later that same day, Goss requested that everyone meet in the trial court's chambers. The parties indicated no court reporter was present because the discussion was supposed to revolve around scheduling. The scope of the meeting far exceeded mere scheduling. Moreover, those who were present later provided conflicting accounts of what occurred. The accounts of what happened during this off-the-record meeting played out at the habeas hearing.

Henricksen and Gonzales testified the defense attorneys and trial court arrived first. Both testified LaHood walked in "aggressively," and "[h]e appeared angry." They discussed scheduling, but after that LaHood began talking about the defense's prior motion for continuance. Henricksen and Gonzales stated LaHood had been upset and confronted the defense attorneys that morning about the way they had filed the motion. Henricksen said he believed they had been "innocuous" with regard to the wording of the motion, but LaHood was still upset. Henricksen had considered the matter closed until LaHood raised it at the "scheduling meeting." According to Henricksen, LaHood called it "a shit show," and was unhappy that in the motion the defense had mentioned "a late disclosure of evidence." Henricksen claimed LaHood was angry because the media had picked up on the language and was asking Goss and LaHood about it. LaHood, believing it was an uncontested motion, questioned the necessity of including the language.

Henricksen then testified that after they finished talking about the motion for continuance, LaHood began to press Gonzales about their intentions with regard to the disclosure. According to Henricksen, it was at this point that the issue of a mistrial came up, raised by LaHood. Henricksen stated LaHood was still angry and advised that if the defense wanted a mistrial, the State would agree, stating "we will pick a better jury, we will be better prepared next time." Gonzales declined the offered mistrial, advising they still needed to look into the matter. Gonzales stated the defense was not worried about the second-chair prosecutor's actions, but "about Jason Goss and him sitting on this for two years." Henricksen said his co-counsel then stated it might come to a point where the defense might "have to file something about prosecutorial misconduct." Henricksen and Gonzales testified that in response to this statement, LaHood "lost it" and "went ballistic at that point." According to Henricksen, LaHood then "started screaming" at Gonzales, "I will destroy your practice … neither of you will get hired on another case in Bexar County[.]" Gonzales also testified about similar threats by LaHood. Henricksen claimed he was worried "this

was going to get violent." Henricksen said this threat from the District Attorney shook him up. Both Henricksen and Gonzales stated they viewed LaHood's comments as a threat to their livelihood and believed he had the power and ability to make good on his threat. Gonzales said LaHood's threats had a "chilling effect on him" and his efforts in defending Martinez. Goss testified, however, that this was not Gonzales's only statement about the confrontation. Rather, he expounded on his "valuable friendship" with LaHood, stating he felt their disagreement may have hurt their friendship. Goss believed this is why Gonzales stated he could not sleep the night after the incident. Henricksen admitted that the next day Goss advised them LaHood later commented that "he didn't want to lose Joe's friendship over it." Judge Valenzuela confirmed that Goss relayed this statement by LaHood.

LaHood's memory of what occurred at the in-chambers meeting was different, as was Goss's. LaHood testified at the habeas hearing that the contention he was mad the media was calling him after the motion for continuance was filed was "a gross mischaracterization." LaHood testified he fields media questions every day and does not "get mad over that." According to LaHood he had heard from Goss that Goss felt the defense put on a show for the media at the hearing on the motion for continuance. LaHood admitted he called it a "shit show."

With regard to raising the mistrial issue, LaHood testified he was trying to determine exactly what Gonzales wanted, pointing out that the State had agreed to a continuance, offered the defense "every resource from the DA's Office," access to Dalton and the second-chair prosecutor, as well as assistance from any number of investigators. Goss said the matter arose when Gonzales raised concerns about the length of time the jury would be out while the defense conducted an investigation into the encounter between Dalton and the prosecutor. In an effort to determine what Gonzales wanted, LaHood said he asked if Gonzales wanted a mistrial, describing the question as "more of a diagnostic." He waited for a response and when none was forthcoming, he stated,

"Judge, give him a mistrial so we can pick a new jury." LaHood denied wanting a mistrial, believing that they had picked a "good jury" and was "happy with our jury." According to LaHood, the State had a strong case and intended to try it to a verdict. Goss echoed LaHood's impression about the trial, stating he felt it "was going very, very well[,]" exactly as he had prepared and planned.

LaHood claimed Gonzales advised the situation was not that simple, stating that if there was going to be a mistrial, he wanted further prosecution barred. LaHood said he scoffed at the notion. LaHood testified that in response, Gonzales threatened to file a motion for prosecutorial misconduct and call a press conference. Goss confirmed LaHood's testimony concerning Gonzales's threat to go to the media, testifying that when he made the threat, Gonzales's "voice was raised, his face was red and he was pointing in my face saying that he is going to go public, and accused me of prosecutorial misconduct." According to Goss, Gonzales was "the first person to scream" and "the first person to raise his voice and to be aggressive in my direction." Goss testified Gonzales's threat was in stark contrast to his previous statement that he believed Goss had not intended to do anything wrong. Gonzales admitted saying he had a problem with Goss and pointed at him. He also admitted the defense might have to allege prosecutorial misconduct, but denied he threatened to go to the media. Henricksen and Judge Valenzuela echoed Gonzales's testimony regarding the alleged threat to go to the press.

LaHood said he then suggested that Gonzales consult the attorney disciplinary rules before taking such action. According to LaHood, at that point appellate attorney Mark Stevens advised that LaHood should not be upset with Gonzales because it was actually Stevens who suggested the notion of prosecutorial misconduct. LaHood admitted that at this point — after Gonzales's threats — he said that if a mistrial was granted the State would pick a better jury and be more prepared for the next one. LaHood also denied threatening the practices of the defense attorneys, but stated

that when Gonzales threatened to call a press conference and allege prosecutorial misconduct, he advised that "in the process of defending this office's honor, I will expose you as the unethical lawyer that you are, and let's see what happens to your law practice." Goss confirmed the gist of this statement. LaHood further stated that as District Attorney, it was his responsibility to defend the integrity and honor of his office.

Judge Valenzuela was subpoenaed to testify at the habeas hearing. With regard to the off-record scheduling hearing at which the issue of a mistrial first arose, she testified LaHood "expressed some concern about the motion for continuance." The judge testified LaHood "didn't seem happy about … the motion for continuance being handled in open court where the media was present." She stated LaHood called it a "shit storm." Judge Valenzuela agreed LaHood was the first to mention a mistrial, stating he was willing "to get a new jury to start all over again, the evidence was what it was." She also agreed Gonzales said "he would possibly have to allege at some point prosecutorial misconduct." The judge testified that in response to this statement, LaHood said "he was going to shut down his practice," but she also recalled LaHood advising Gonzales that he had no right to file a motion in bad faith. She did not feel LaHood's response was warranted. Judge Valenzuela felt LaHood was "mad" and she was concerned about the escalation in volume and tone, fearing a possibility "that somebody would get hurt physically." However, there was never any physical violence, and afterward, the attorneys retired to another room to discuss further proceedings in the matter.

As a result of discussions between the attorneys, the defense was provided an opportunity to interview the second-chair prosecutor and Dalton. Henricksen testified that during the defense telephone interview of Dalton, the information provided "pretty much lined up with the initial disclosure that [Goss] had made to the Judge in chambers that — in terms of where the relationship happened, how it happened[.]" Dalton confirmed the one-time sexual encounter, but could not

recall the name of the second-chair prosecutor and could only provide a basic description of her. Henricksen testified Dalton told the defense he had no contact with the second-chair prosecutor since their "one-time encounter" and he did not even recall her position in the District Attorney's Office. Both the second-chair prosecutor and Dalton denied having any contact regarding the case.

During the defense interview of the second-chair prosecutor, she advised that she recognized Dalton when she reviewed the prosecution guide based on his photo and nickname, "Vegas." She confirmed — as Goss had previously told the defense — she had no contact with Dalton since their encounter and had no contact with the case since her disclosure to Goss. Under questioning from the habeas court judge, Henricksen admitted the defense never uncovered any evidence to indicate the second-chair prosecutor directed the investigation by police or had any part in the charging decision. But Henricksen opined that it was his belief the prosecutor was "holding back on some things as far as admitting to the actual relationship." He also claimed there were discrepancies between what she allegedly told Goss and what she stated in the interview with regard to her encounter with Dalton.

According to Gonzales, after the interview, he contacted Jay Norton, Chief of the District Attorney's Conviction Integrity Unit. Gonzales wanted to speak with Norton to see if they could devise a solution to avoid a mistrial. A possible plea bargain was suggested, but Norton advised he had no authority to negotiate a plea agreement. Then, the issue of a mistrial arose. At the habeas hearing, the testimony was conflicting when it came to who said what during this meeting. According to Gonzales, he told Norton LaHood suggested a mistrial, but neither he nor Henricksen agreed. Norton's testimony was in opposition. Norton testified it was Gonzales and Henricksen that wanted a mistrial, but Goss and LaHood were opposed to it. At Gonzales's request, Norton discussed the concept of a mistrial with LaHood the next day. Norton stated LaHood was initially opposed, but after a while, he agreed.

### *Mistrial and Habeas Phase*

On February 16, 2017, just nine days after voir dire, and on the heels of the meeting between the defense and Norton, the defense moved for a mistrial in open court. The defense attorneys claimed they did not want a mistrial and the motion was made reluctantly based on the untimely disclosure of information that might constitute impeachment evidence under *Brady*. Although the State agreed to a mistrial, it denied any wrongdoing or that the defense was forced into requesting a mistrial based on any action by the State. The trial court granted the motion for mistrial and reset the trial for May 2017. Thereafter, Martinez filed his pretrial application for writ of habeas corpus. In his application, Martinez alleged further prosecution based on the murder indictment was barred based on double jeopardy.

A hearing on Martinez's habeas application was held in April 2017. The trial court denied the application, entering written findings of fact and conclusions of law in support of its decision. Thereafter, Martinez perfected this appeal.

### *Analysis*

As noted above, Martinez contends in this appeal that the habeas court erred in denying his application for writ of habeas corpus. He argues retrial is barred by the Double Jeopardy Clause of the Fifth and Fourteenth Amendments[4] to the United States Constitution because: (1) the State goaded him into moving for a mistrial; (2) the State intentionally engaged in conduct — failure to disclose exculpatory evidence — with the intent to avoid an acquittal; and (3) the State

---

[4] Martinez does not challenge the habeas court's ruling based on the double jeopardy clause found within the Texas Constitution. *See* TEX. CONST. art. I, § 14. However, the language in both the state and federal double jeopardy clauses is markedly similar, and as numerous courts have held, the double jeopardy provision in the Texas Constitution provides substantially identical protection to that provided by the United States Constitution. *Compare* U.S. Const. amend. V *with* TEX. CONST. art. I, § 14; *e.g.*, *State v. Blackshare*, 344 S.W.3d 400, 405 n.8 (Tex. Crim. App. 2011); *Bien v. State*, 530 S.W.3d 177, 180 (Tex. App.—Eastland 2016), *aff'd*, Nos. PD-0365 & PD 0366, 2018 WL 2715380 (Tex. Crim. App. June 6, 2018); *Ex parte Hill*, 464 S.W.3d 444, 446 (Tex. App.—Dallas 2015, pet. ref'd); *State v. Almendarez*, 301 S.W.3d 886, 889 n.8 (Tex. App.—Corpus Christi 2009, no pet.). Thus, any analysis under the Texas Constitution would be the same.

intentionally failed to disclose exculpatory evidence with the intent to protect a colleague from personal embarrassment.[5]

### Standard and Scope of Review

It is the burden of the habeas applicant to prove his allegations by a preponderance of the evidence. *Ex parte Coleman*, 350 S.W.3d 155, 160 (Tex. App.—San Antonio 2011, no pet.) (citing *Ex parte Chandler*, 182 S.W.3d 350, 353 n.2 (Tex. Crim. App. 2005)); *State v. Webb*, 244 S.W.3d 543, 547 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (same). The applicant must also provide the court with a sufficient record to prove his allegations. *Coleman*, 350 S.W.3d at 160. Our review of the habeas court's ruling may include the evidence adduced at the habeas hearing and the record as it existed before the habeas court at the time of the hearing. *Id.*

We must review a habeas court's decision granting or denying relief requested in an application for writ of habeas corpus under an abuse of discretion standard. *Ex parte Baldez*, 510 S.W.3d 477, 478 (Tex. App.—San Antonio 2014, no pet.) (citing *Kniatt v. State*, 206 S.W.3d 657, 664 (Tex. Crim. App. 2006); *Ex parte Cummins*, 169 S.W.3d 752, 755 (Tex. App.—Fort Worth, 2005, no pet.)); *see Ex parte Peralta*, 87 S.W.3d 642, 645 (Tex. App.—San Antonio 2002, no pet.) (holding abuse of discretion standard applies with respect to habeas court's ruling on habeas corpus petition based on double jeopardy). Notably, in applying this standard, i.e., we must "review the record evidence in the light most favorable to the trial court's ruling[.]" *Kniatt*, 206 S.W.3d at 664; *Ex parte Uribe*, 516 S.W.3d 658, 665 (Tex. App.—Fort Worth 2017, pet. ref'd). Moreover, we must afford great deference to the habeas court's findings and conclusions, especially when, as

---

[5] Martinez has cited no specific authority, nor have we discovered any, holding that failure "to disclose exculpatory evidence with the specific intent to protect a colleague from personal embarrassment" is an independent ground for challenging a mistrial based on double jeopardy under *Oregon v. Kennedy*, 456 U.S. 667 (1982) or *Ex parte Lewis*, 219 S.W.3d 335 (Tex. Crim. App. 2007). Accordingly, we will not consider this as a separate issue, but shall review the allegations within this issue as part of our review of Martinez's other complaints, i.e., whether the State's conduct in this matter was undertaken with the intent to goad Martinez into moving for a mistrial or to avoid the possibility of an acquittal.

here, they involve determinations of credibility and demeanor. *See Ex parte Perusquia*, 336 S.W.3d 270, 274–75 (Tex. App.—San Antonio 2010, pet. ref'd) (citing *Ex parte Wheeler*, 203 S.W.3d 317, 324 (Tex. Crim. App. 2006); *Ex parte Peterson*, 117 S.W.3d 804, 819 (Tex. Crim. App. 2003, *overruled in part on other grounds*, *Ex parte Lewis*, 219 S.W.3d 335, 371 (Tex. Crim. App. 2007)); *Uribe*, 516 S.W.3d at 665. The mere fact that we might decide the matter differently is insufficient to constitute an abuse of discretion; rather, to overturn the habeas court's ruling on a petition for writ of habeas corpus, we must find the ruling was outside the zone of reasonable disagreement. *Manning v. State*, 114 S.W.3d 922, 926 (Tex. Crim. App. 2003); *Uribe*, 516 S.W.3d at 665.

### *Applicable Law*

As a general rule, the State may not put defendants in criminal cases in jeopardy twice for the same offense. *Pierson v. State*, 426 S.W.3d 763, 769 (Tex. Crim. App. 2014); *see* U.S. CONST. amends. V, XIV; *see also* TEX. CONST. art. I, § 14. There are, however, exceptions to the general rule and such exceptions endure because there are situations in which a defendant's right to be tried before a particular tribunal should be subordinated "to the public interest in affording the prosecutor one full and fair opportunity to present [the State's] evidence to an impartial jury." *Arizona v. Washington*, 434 U.S. 497, 505 (1978). As is applicable here, double jeopardy generally does not preclude the retrial of a criminal defendant if the defendant requested the mistrial. *Oregon v. Kennedy*, 46 U.S. 667, 672 (1982). There is however, a "narrow exception" to this general rule, the parameters of which were set out in *Kennedy*. *Id.* at 673–79.

Prior to *Kennedy*, numerous Supreme Court cases indicated "that even where the defendant moves for a mistrial, there is a narrow exception to the rule that the Double Jeopardy Clause is no bar to retrial." *Id.* at 673 (citing *United States v. DiFrancesco*, 449 U.S. 117, 130 (1980); *United States v. Dinitz*, 424 U.S. 600, 611 (1976); *United States v. Jorn*, 400 U.S. 470, 485 (1971); *United*

*States v. Tateo*, 377 U.S. 463, 468 n.3. (1964)).  In these earlier cases, the exception was described as applying to instances when a prosecutor intended to provoke a mistrial, but further suggested it also applied when there was "bad faith conduct" or "harassment" by the prosecutor.  *Id.* at 674 (quoting *Dinitz*, 424 U.S. at 611).   The *Kennedy* court rejected these latter notions, stating they offered "virtually no standards for their application" particularly given that every act by a rational prosecutor during a trial is designed to "prejudice" a defendant in order to secure a finding of guilt. *Id.*  Thus, the Court held "prosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion … does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause."   *Id.* at 675-76.   Accordingly, the exception applies "[o]nly where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial." Then and only then may a defendant assert double jeopardy in order to bar a retrial "after having succeeded in aborting the first on his own motion."  *Id.* at 676.

The Texas Court of Criminal Appeals adopted the *Kennedy* standard in *Ex parte Lewis*, rejecting prior precedent that held the double jeopardy clause of the Texas Constitution barred retrial if the prosecutor acted recklessly.  219 S.W.3d at 337, 371 (overruling *Ex parte Bauder*, 974 S.W.2d 729 (Tex. Crim. App. 1998)).  Thus, under *Lewis*, a retrial is barred if a prosecutor engages in conduct with the intent to goad or provoke the defense into requesting a mistrial.  *Id.* at 336.  After *Lewis*, but in the same term of court, the court of criminal appeals was called upon to discuss the narrow *Kennedy* exception in the context of a prosecutor's failure to disclose exculpatory *Brady* material.  *See Ex parte Masonheimer*, 220 S.W.3d 494 (Tex. Crim. App. 2007).

In *Masonheimer*, the defendant was charged with murder.  *Id.* at 495.  The defendant's first two trials ended in mistrials at the defendant's request, "provoked by the State's intentional failure

to disclose exculpatory evidence with the specific intent to avoid an acquittal."[6]  *Id.*  Prior to his third trial, the defendant filed a pretrial application for writ of habeas corpus, which the trial court granted.  *Id.* at 503, 505.  The court of appeals reversed.  *Id.* at 505.  Upon review, the Texas Court of Criminal Appeals reviewed *Kennedy* and noted the Court had cited with approval several cases in which retrial had been barred when the prosecution deliberately engaged in conduct with the specific intent to avoid an acquittal.  *Id.* at 507–08.  Accordingly, after viewing the evidence in the light most favorable to the trial court's ruling, the Texas Court of Criminal Appeals held the record supported a finding that the defendant's two prior motions for mistrial were "necessitated" by the State's deliberate failure to disclose *Brady* material with the specific intent to avoid the possibility of an acquittal.  *Id.*  In sum, the court concluded that under *Kennedy*, such deliberate conduct, accompanied by specific intent to avoid the possibility of an acquittal, barred any retrial.  *Id.*

Thus, in Texas, when a defendant moves for a mistrial and subsequently claims retrial is barred by double jeopardy, the habeas court, and all subsequent reviewing courts, must determine whether: (1) the prosecutor engaged in conduct to goad or provoke the defense into requesting a mistrial; or (2) the prosecutor deliberately engaged in the conduct at issue with the intent to avoid an acquittal.  *Masonheimer*, 220 S.W.3d at 507–08; *Lewis*, 219 S.W.3d at 336; *Coleman*, 350 S.W.3d at 160.  As applied to this case, the issue is whether, viewing the evidence in the light most favorable to the habeas court's ruling, the habeas court abused its discretion in concluding Martinez failed to prove by a preponderance of the evidence that the prosecutors engaged in conduct — withholding of potential impeachment evidence under *Brady* or Article 39.14(h) — with the intent to goad or provoke the defense into moving for a mistrial after jeopardy attached

---

[6] Unlike this case, the defense, the State, the trial court, and the court of appeals in *Masonheimer* agreed the State failed to disclose exculpatory *Brady* material.  *Masonheimer*, 220 S.W.3d at 494 n.1.

or to avoid a possible acquittal.[7] *See Masonheimer*, 220 S.W.3d at 507–08; *Lewis*, 219 S.W.3d at 336; *Coleman*, 350 S.W.3d at 160.  The Texas Court of Criminal Appeals set out non-exclusive factors in *Wheeler* to assist trial and appellate courts in determining whether the prosecutor had the requisite intent so as to bar any retrial based on double jeopardy: (1) Did it reasonably appear, at the time the prosecutor acted, that the defendant would likely obtain an acquittal?; (2) Was the alleged misconduct repeated after admonitions from the trial court?; (3) Did the prosecutor provide a "good faith" explanation for his conduct?; (4) Was the conduct "clearly erroneous"?; (5) Was there a plausible basis — factually or legally — for the conduct, despite any ultimate impropriety?; and (6) Were the prosecutor's actions leading up to the mistrial consistent with inadvertence, negligence, or lack of judgment, or were they consistent with intentional misconduct?  203 S.W.3d at 323–24.[8]

### *Application*

In determining whether the habeas court abused its discretion in denying Martinez's application, we consider the evidence in the light most favorable to the court denial using the *Wheeler* factors.  We consider each factor in turn.

---

[7] *Brady* material includes evidence favorable to the defense, i.e, material, exculpatory evidence and impeachment evidence.  *Pena v. State*, 353 S.W.3d 797, 811–12 (Tex. Crim. App. 2011).  Exculpatory evidence is evidence that may justify, clear, or excuse the defendant.  *Id.*  Impeachment evidence is evidence that "disputes, disparages, denies, or contradicts other evidence."  *Id.*  However, in addressing the habeas petition in this case, the habeas court should not have concerned itself with the propriety of the trial court's *Brady* determination.  *See Coleman*, 350 S.W.3d at 160.  The granting of the mistrial cured any due process violation based upon *Brady*.  *Id.*  Thus, in this case, the habeas court's findings and conclusions relating to the nature and propriety of disclosure of the alleged *Brady* material are irrelevant.  *See id.*

[8] Courts have modified the *Wheeler* factors following the disavowment of *Bauder* by the court of criminal appeals in *Lewis* to exclude an original sixth factor — reckless misconduct by the prosecutor.  *See, e.g., State v. Yetman*, 516 S.W.3d 33, 36–37 (Tex. App.—Houston [14th Dist.] 2016, no pet.); *Ex parte Roberson*, 455 S.W.3d 257, 260 n.1 (Tex. App.—Fort Worth 2015, pet. ref'd).

1. *Did it Reasonably Appear at the Time of Prosecutors' Actions or Inactions Prior to the Mistrial that Martinez Would Likely Obtain an Acquittal?*

By the time Goss had fully disclosed the details of the encounter between the second-chair prosecutor and Dalton, the parties had completed voir dire, the State had presented its opening statement, and the State had presented and the defense had cross-examined three witnesses. At this point, Goss had, in his opening statement, advised the jury that he expected the evidence to show that Carter was purchasing heroin from Martinez, and on the night of her murder, Carter met Martinez for that purpose. Her cell phone records would show she received a call, shortly before her murder, from a TracFone. That phone was subsequently determined to have called Gregory Dalton just after the murder. Goss told jurors he expected Dalton would testify that:

- He drove a white van with decals;
- He knows Martinez;
- He picked up Martinez near the location of the murder, but he was unaware of the murder;
- He called Martinez the night of the murder when he was unable to locate him;
- Martinez paid him $400 or $500 for picking him up;
- Martinez told him he shot the girl featured in a news story;
- Martinez said he asked to borrow the victim's cell phone, the victim gave him her phone, he stepped out of her vehicle, and then shot her five times in the right side of the head.

According to the State, other evidence would confirm that a TracFone that had called Carter on the night of the murder called Dalton around the time Dalton stated Martinez called and asked Dalton to pick him up. In addition, the evidence would show Carter was shot five times in the right side of the head, just as Dalton was told by Martinez. Moreover, Carter's cell phone was missing, corroborating Dalton's claim that Martinez said he took her cell phone.

Also, L.C., the State's first witness, testified he saw a Honda Accord pull up and stop under a street light in front of the empty house next door. L.C. testified he saw a Hispanic male in a dark hoodie get out of the passenger side of the car. The male was "messing with his pockets" as if he

was removing something. Just a couple of minutes later, L.C. heard multiple gunshots. L.C. testified he saw a white van — a van that matched the description of the one driven by Dalton — driving away from the Honda Accord a few minutes after the shooting. L.C.'s grandmother testified she also heard gunshots and called 911.

Officer Wehe, the first responding officer testified that when he arrived he saw the Honda Accord with its passenger door open. The victim — later identified as Carter — was dead in the driver's seat. Her feet were crossed and her hands were in her pockets, which according to the officer made it appear she was relaxed before she was shot. Officer Wehe believed she had been shot, but could not determine how many times.

Goss and LaHood testified at the habeas hearing that they believed the trial was going well. Although LaHood was the first person to mention a mistrial, he testified this was only in an attempt to determine what the defense wanted with regard to remedying the disclosure about the encounter between the second-chair prosecutor and Dalton. According to the defense, LaHood stated the State would agree to a mistrial and would "pick a better jury and be more prepared for trial" next time. However, LaHood specifically denied wanting a mistrial, stating his belief that he and Goss had picked a "good jury." He stated he was "happy with our jury" and the State intended to try the case to a verdict. Goss corroborated LaHood's statements about the status of the trial just prior to the mistrial, stating he felt the prosecution of Martinez "was going very, very well[,]" just as he had prepared and planned.

Viewing the evidence in the light most favorable to the habeas court's ruling, *see Kniatt*, 206 S.W.3d at 664, we hold it does not support the appearance that during the time leading up to the mistrial that Martinez was likely to obtain an acquittal. *See Wheeler*, 203 S.W.3d at 324. Based on its opening statement, the State expected the evidence to show the same TracFone made telephone calls to Carter and Dalton around the time of the murder. Dalton would testify he

received a call from Martinez near the time of the murder, he picked Martinez up near the site of the murder, and Martinez confessed to the murder — supplying Dalton with details only the perpetrator would know. The State believed Dalton's testimony would be confirmed by cell phone evidence, forensic evidence, and other witnesses. Both prosecutors testified at the habeas hearing that they felt they had a good jury and the case was going well. The habeas court, in its discretion, could have found that LaHood's decision to raise the specter of a mistrial was done for the reason he stated — to feel out the defense in an effort to "diagnose" what it wanted following the disclosure.

Accordingly, viewing the evidence in the light most favorable to the habeas court's ruling, the habeas court could have determined — as do we — that it did not reasonably appear in the time leading up to the mistrial that Martinez was likely to obtain an acquittal. *See id.* The evidence pertinent to the first *Wheeler* factor supports the habeas court's ruling. *See id.*

2. <u>*Did Goss Repeatedly Fail to Disclose All Information Relating to the Encounter Between the Second-Chair Prosecutor and Dalton After Admonitions from the Trial Court?*</u>

Despite Goss's apparent concerns after his full interview with Dalton, the evidence shows Valdez — chief of the appellate section — and Ballantyne — chief of the ethical disclosure unit — did not believe disclosure was necessary. However, they *suggested* Goss could, out of an abundance of caution, disclose the information about the encounter between the second-chair prosecutor and Dalton to the trial court. According to Goss, after speaking to Valdez and Ballantyne, the State requested an ex parte, in camera hearing with the trial court before the jury was sworn. During that hearing, Goss made a full disclosure to the trial court. Thereafter, the trial court stated it did not believe "the extent of their relationship" between the second-chair prosecutor and Dalton required immediate disclosure. The trial court also opined that "the disclosure may be necessary," but it might not be admissible. The trial court expressed its belief that "it would be in

poor taste just to throw it out there," and agreed to consider remedies that might minimize any harm to the second-chair prosecutor.

The trial judge stated her "gut" told her she "would want it disclosed," when Goss asked if she was ordering him to disclose the information to the defense. However, Judge Valenzuela then stated:

> This is — this is not — I mean if I say disclose, you need to disclose, and you decide when you do it.
>
> But this is just my opinion for whatever it's worth … if this is information you've had since 2014 … [o]kay 2015 … I wouldn't put yourself — that's my — I'm just giving you my advice … I wouldn't wait any longer ….

Moreover, Judge Valenzuela advised Goss to withhold the name of the second-chair prosecutor while she considered potential remedies, stating she would take "the responsibility for the delay in disclosure." The trial judge told Goss, "say I told you that I thought the disclosure was appropriate but to hold off so that I could make sure that I had an appropriate remedy."

Thus, the record does not show that at any time during the ex parte hearing that Goss was *ordered* to disclose to the defense the encounter between Dalton and the second-chair prosecutor. Judge Valenzuela's strongest statement during the entire ex parte hearing was "I mean if I say disclose, you need to disclose[.]" Moreover, at the habeas hearing Judge Valenzuela testified she did not order Goss to do anything at that time, agreeing she left it up to Goss. Viewing the evidence in the light most favorable to the habeas court's ruling, we hold this does not constitute an *order* to disclose. *See Kniatt*, 206 S.W.3d at 664

Even though he was not ordered to disclose the information — and was, in fact, advised to withhold certain information — immediately after the ex parte hearing and before the jury was sworn, Goss disclosed the "one-time sexual encounter" to the defense, withholding the name and position of the prosecutor. He also failed to disclose that she had reviewed the prosecution guide.

However, as previously noted, if Goss had disclosed the position of the prosecutor or that she had reviewed the guide, he would have, in essence, violated Judge Valenzuela's admonishment not to disclose her name. To suggest that disclosing her position or her review of the guide would not have revealed her identity is farcical. The defense attorneys had worked in the courthouse for years and it would have taken no time at all for them to discover which female prosecutor in the 437th District Court had suddenly been removed from the Martinez case. And, who but a prosecutor in the prosecuting court would review the prosecution guide when it was first provided to the District Attorney's Office? Thus, the evidence shows Goss took the trial court's "advice" and disclosed the encounter between a yet-to-be-named female prosecutor and Dalton, withholding her name and any additional information that might have revealed her name, as instructed by the court.

The record shows it was only after the jury was sworn and the State had begun presenting its case that Goss was ordered to make a full disclosure to Martinez's defense team. The evidence of how this occurred was conflicting. According to Judge Valenzuela, during an "off-the-record" conference in chambers, she inquired as to whether Goss had told the defense "everything." Goss testified the trial judge stated she knew he had made certain disclosures, but had withheld information at her request. What is uncontested is at this point, and for the first time, the trial court ordered Goss to immediately make a full disclosure, which he did. Although Henricksen claimed he was upset that he was just learning the details, everyone returned to the courtroom and trial resumed.

When we view the evidence relating to the ex parte discussion and the subsequent order to disclose in the light most favorable to the habeas court's ruling, *see Kniatt*, 206 S.W.3d at 664, we hold there is no evidence that Goss — or any other prosecutor or member of the District Attorney's Office — continued to withhold information after being ordered to disclose it. *See Wheeler*, 203

S.W.3d at 324. Moreover, neither Valdez nor Ballantyne instructed or advised Goss to disclose the information to the defense or to the trial judge. Rather, they stated they did not believe disclosure was required, but if Goss wanted to disclose the information "in an abundance of caution," he might make an ex parte disclosure to the trial court to determine what the court believed he should do. Goss did as instructed by his colleagues and by the trial court. There was no withholding of information, i.e., "repeated misconduct" after advice from other members of the office or admonitions by the trial court. *See Wheeler*, 203 S.W.3d at 324. The evidence shows the trial court never admonished Goss about his failure to disclose the details of the encounter between the Dalton and the second-chair prosecutor. *See id.* Nor did the trial court order him to disclose the information until after the jury was sworn and the State began presenting its case. *See id.* Goss immediately complied, as instructed, each time he was told to disclose. *See id.* Accordingly, this factor does not suggest an attempt to goad the defense into a mistrial or an attempt to avoid an acquittal. *See Masonheimer*, 220 S.W.3d at 507–08; *Lewis*, 219 S.W.3d at 336; *Coleman*, 350 S.W.3d at 160.

### 3. *Did Goss Provide a "Good Faith" Explanation for His Lack of Disclosure?*

The undisputed evidence shows that when Goss found out about the encounter between the second-chair prosecutor and Dalton, he immediately "firewalled" the prosecutor from the case. He questioned the prosecutor, asking her if she had additional contact with Dalton after their "one-time encounter." She advised she had not — Dalton later confirmed her statement and there was no evidence to the contrary. Goss testified he considered the second-chair prosecutor's encounter with Dalton a "conflict," and believed he took appropriate steps to deal with it. Subsequently, he stated numerous times that he withheld the information — until the week before trial when he learned Dalton knew far more than he originally disclosed — out of respect for his colleague, to

protect her reputation.  Then, though advised the information need not be disclosed, Goss chose to disclose the information to the trial court, and then upon order, to the defense in full.

The habeas court was entitled to find Goss's decision to withhold disclosure of the second-chair prosecutor's one-time encounter with Dalton was based on his good-faith desire to protect a colleague's reputation in the legal community and at the courthouse.  *See Kniatt*, 206 S.W.3d at 664; *Perusquia*, 336 S.W.3d at 274–75.  Viewing the evidence in the light most favorable to the habeas court's ruling, *see Kniatt*, 206 S.W.3d at 664, we cannot say it was an abuse of discretion to find Goss provided a good-faith explanation for his failure to disclose fully at an earlier point in time.  *See Wheeler*, 203 S.W.3d at 324.  The evidence relating to this third *Wheeler* factor does not suggest an attempt to force a mistrial or avoid an acquittal.  *See Masonheimer*, 220 S.W.3d at 507–08; *Lewis*, 219 S.W.3d at 336; *Coleman*, 350 S.W.3d at 160.

### 4. *Was Goss's Failure to Disclose "Clearly Erroneous"?*

It is undisputed that until a week before trial, no one in the District Attorney's Office had any idea Dalton would be an important witness for the State.  Thus, Dalton's encounter with a prosecutor seemed immaterial.  *See Pena*, 353 S.W.3d 797, 811–12 (holding *Brady* material includes material, exculpatory evidence and impeachment evidence).  It was only when Goss and LaHood interviewed Dalton the week before trial that they learned he had failed to provide law enforcement with all of the information he had relating to Martinez and the murder of Carter.  Goss testified it was at this point that he began to see possible impeachment value in the information concerning the one-time encounter between the second-chair prosecutor and Dalton.  *See id.*  Concerned by the possibility, Goss consulted "experts" — Valdez and Ballantyne — who advised they did not believe the information had to be disclosed.  Nevertheless, Goss disclosed the information to the trial court, which advised him to make a partial disclosure.  Goss complied and then fully disclosed when ordered to do so by the trial court.

The habeas court found there was no evidence the second-chair prosecutor or Dalton had further contact beyond the single encounter. Rather, all of the evidence suggested there was no additional contact. Moreover, the evidence supports the habeas court's finding that the second-chair prosecutor was "firewalled" from the case by Goss, and she had no further involvement in the case after she told Goss about Dalton. She had no interaction with any witnesses and was not involved in charging decisions, plea negotiations, trial strategy, or any other aspect of the case. The habeas court further found there was no evidence Dalton attempted to use the one-time encounter "to curry favor from" the District Attorney's Office or law enforcement. This finding is supported by the evidence. Thus, the habeas court found the defense failed to establish the encounter between the prosecutor and Dalton was material, relevant, or admissible. Thus, with regard to *Brady*, we cannot say the failure to disclose prior to the trial court's order was "clearly erroneous." The habeas court failed to see — as do we — how the evidence would be material or admissible, even for impeachment purposes given the facts: (1) Dalton and the second-chair prosecutor had a one-time sexual encounter in 2011 or 2012 — three or four years before the murder; (2) there was no further contact after the single encounter; (3) the second-chair prosecutor only recognized Dalton from his picture and nickname; (4) Dalton did not remember the second-chair prosecutor's position in the office and had only a vague recollection of what she looked like; (5) Dalton was never considered a suspect by law enforcement; (6) the second-chair prosecutor reviewed only the prosecution guide and had nothing else to do with the case after her disclosure; and (7) Dalton never attempted to use his encounter with the prosecutor to his advantage. Accordingly, we do not find the decision to withhold the evidence prior to the trial court's disclosure order to be "clearly erroneous" under *Brady*. *See Wheeler*, 203 S.W.3d at 324.

However, section 39.14(h) of the Texas Code of Criminal Procedure — known as The Michael Morton Act — does not require evidence to be material or admissible for purposes of

disclosure. *See* TEX. CODE CRIM. PROC. ANN. art. 39.14(h). Rather it "creates a general, continuous duty of the State to disclose before, during, or after trial any discovery evidence tending to negate the guilt of the defendant or reduce the punishment the defendant could receive." *Hart v. State*, Nos. 14-15-00468-CR & 14-15-00469-CR, 2016 WL 4533419, at *5 (Tex. App.— Houston [14th Dist.] Aug. 30, 2016, no pet.) (mem. op., not designated for publication (citing TEX. CODE CRIM. PROC. ANN. art. 38.14(h)). We hold — given the undisputed evidence as set out in (1) through (7) above — the habeas court could have concluded the failure to disclose the encounter prior to the trial court's order was not "clearly erroneous" even under Article 39.14(h). The one-time sexual encounter between the second-chair prosecutor, who was firewalled from the case prior to indictment, with Dalton, a potential "star witness," would not tend to negate Martinez's guilt or reduce his sentence under the facts as found by the habeas court in its discretion. *See Kniatt*, 206 S.W.3d at 664. Accordingly, we hold this *Wheeler* factor does not lend itself to a finding of goading or fear of an acquittal by prosecutors. *See Masonheimer*, 220 S.W.3d at 507– 08; *Lewis*, 219 S.W.3d at 336; *Coleman*, 350 S.W.3d at 160.

5. *Was There a Plausible Basis — Legally or Factually — for Goss's Failure to Disclose Despite Any Ultimate Impropriety?*

As discussed above, Goss's reasoning for not disclosing the encounter between Dalton and the second-chair prosecutor until ordered to do so by the trial court was based on his belief that this was nothing more than a conflict that could be resolved by way of a firewall and his concern for his colleague and her reputation. The first reason proffered by Goss falls within the legal realm. In the "clearly erroneous" analysis, we held that under the facts of this case, the habeas court did not err in finding the encounter — the information withheld — immaterial, irrelevant, or inadmissible. Nor, as we concluded, did it tend to negate Martinez's guilt given the second-chair prosecutor's complete lack of participation in the case, the absence of contact between the relevant

individuals, and nonexistence of any agreement with Dalton for his testimony. Thus, even if it should ultimately be determined that disclosure was mandated under *Brady* or Article 39.14(h), we hold there was a legally plausible basis for Goss to withhold the information prior to the trial court's order to disclose.

There was also a plausible factual basis for Goss's decision to withhold the information — respect and concern for his colleague and her reputation. The trial court's subsequent order to disclose the encounter and its ultimate propriety, does not detract from the plausible factual basis for Goss's decision to withhold the information and "firewall" the prosecutor from the case. The trial court also expressed its deep concern about what would happen if the information was disclosed without some court-crafted remedy to minimize the harm to the second-chair prosecutor and her reputation. If the trial court was concerned about the disclosure in the absence of a remedy, how can it be argued that Goss's decision to withhold was less than plausible, even if later determined to be improper? Viewing the bases provided by Goss for withholding the information in the light most favorable to the habeas court's denial of Martinez's application, we cannot say the habeas court abused its discretion. *See Kniatt*, 206 S.W.3d at 664. Thus, this fifth *Wheeler* factor does not suggest prosecutors engaged in behavior in an effort to goad the defense into a mistrial or that they acted out of fear of an acquittal. *See Masonheimer*, 220 S.W.3d at 507–08; *Lewis*, 219 S.W.3d at 336; *Coleman*, 350 S.W.3d at 160.

6. *Was the Prosecutors' Failure to Disclose the One-Time Encounter Consistent with Inadvertence, Negligence, or Lack of Judgment, or Was it Consistent with Intentional Misconduct?*

As a whole, the prosecutors involved in this matter did not believe the information about the one-time encounter needed to be disclosed at all, especially prior to the full interview with Dalton a week before trial. Up until a week before trial, Goss firmly believed he had dealt with the disclosure by the second-chair prosecutor appropriately — he removed her from the case and

created a firewall so that she would have no further contact with anyone involved. Thereafter, when he learned about the additional testimony Dalton intended to provide, he began to second-guess his decision. Accordingly, he brought his concerns to LaHood. Goss and LaHood both testified they did not believe the encounter fell within the purview of *Brady* or otherwise required disclosure. Nevertheless, they consulted the heads of the appellate and ethical integrity units. Neither Valdez or Ballantyne believed disclosure was mandated, but offered a solution in the event Goss and LaHood still had concerns. Goss decided to make a full disclosure to Judge Valenzuela and abided by her advice and subsequent order. The evidence shows that before the jury was sworn — and in accord with the trial court's recommendation — Goss advised Martinez's defense counsel, Henricksen, that a prosecutor had a one-time sexual encounter with Dalton, a State's witness. Henricksen took no action at that time. Goss's failure to disclose the prosecutor's identity or other information that would have revealed her identity was based on the trial court's direction not to disclose her name. Then, when ordered to make a full disclosure, Goss fully complied. The decisions by Goss and LaHood to seek advice from the head of the appellate and ethical integrity units — and subsequently the trial court itself — belies any intent to engage in misconduct. If Goss or LaHood desired to intentionally withhold information from the defense — information they believed they should disclose — they could have simply said nothing. Goss could have kept the second-chair prosecutor's disclosure to himself, figuring it would never come out. LaHood and Goss could have decided between themselves disclosure was not mandated instead of seeking additional opinions. And once Valdez and Ballantyne told Goss they did not believe disclosure was mandated, he could have believed he had done his due diligence and moved on, but he did not. Rather, he went to the trial court with a full and complete disclosure.

Given the evidence of the actions taken by the prosecutors in this case and their testimony relating thereto, the trial court was within its discretion in finding their actions were inconsistent

with intentional misconduct. *See Kniatt*, 206 S.W.3d at 664. After analyzing the final *Wheeler* factor, we hold the evidence does not suggest the actions or inactions of the prosecutors were undertaken out of fear of an acquittal or for the purpose of goading the defense into moving for a mistrial. *See Masonheimer*, 220 S.W.3d at 507–08; *Lewis*, 219 S.W.3d at 336; *Coleman*, 350 S.W.3d at 160.

7. <u>*Did LaHood's Threats to "Shut Down" the Practices of Defense Counsel Goad Martinez into Moving for a Mistrial or Were They Made Out of Fear of an Acquittal? (Non-Wheeler Consideration)*</u>

Although the *Wheeler* factors were designed to assist the courts in assessing whether prosecutors intended to goad a defendant into a mistrial or acted in an effort to avoid an acquittal, the factors are non-exclusive. *See Wheeler*, 203 S.W.3d 323. Beyond the *Wheeler* factors, Martinez points to the threats by LaHood to shut down the practices of the defense attorneys as evidence of his intent to goad him into a mistrial.

As set out in detail above, during an off-the-record meeting in chambers, a heated discussion developed concerning Goss's actions in this case and the actions the defense would need to take in response. According to testimony from Henricksen and Gonzales, LaHood was angry and ranting, threatening to "shut down" the practices of both men. LaHood denied this, although Judge Valenzuela testified the threat was made. LaHood testified Gonzales threatened to allege prosecutorial misconduct and seek redress with the media. Goss confirmed Gonzales threatened to allege prosecutorial misconduct, pointing at him.

All those who were present agreed LaHood was the first to mention the specter of a mistrial. But he testified this was simply an effort to determine what it was the defense wanted in an effort to remedy the matter. Both LaHood and Goss testified they did not desire a mistrial. Martinez disagrees, arguing LaHood's behavior was nothing more than an attempt to induce the defense into

requesting a mistrial. According to Martinez, the State needed to force the defense to move for a mistrial to avoid double jeopardy given the jury had been empaneled and sworn.

The habeas court found LaHood "engaged [in] what one witness properly called a 'rant.'" The habeas court further found LaHood stated that he would agree to a mistrial and would pick a better jury and be more prepared for trial. According to the habeas court's finding, LaHood "became enraged and threatened to 'shut down' the defense lawyers' practices, to go to the media and do whatever it took." However, the habeas court concluded, that although LaHood behaved unprofessionally, "neither the intent nor the effect of his behavior was to force the defense to move for mistrial." Rather, the habeas court concluded that if done with any intent, LaHood's actions were taken "to attempt to deter the claim by the defense of jeopardy [attaching] by reason of prosecutorial misconduct, an issue separate from the mistrial." We agree.

Reviewing the evidence in the light most favorable to the habeas court's denial of Martinez's habeas application, *see Kniatt*, 206 S.W.3d at 664, we hold the habeas court did not err in accepting testimony by Goss and LaHood that the State did not desire a mistrial. Rather, LaHood's rant and threats were made only in an effort to deter the defense from alleging prosecutorial misconduct, not to force a mistrial. When the evidence is viewed in the proper light, the habeas court could certainly have concluded from the evidence, as do we, that LaHood's threats were related to the defense threats to allege prosecutorial misconduct, which was separate from the matter of a mistrial.

## CONCLUSION

The ultimate issue for the habeas court was whether Martinez proved by a preponderance of the evidence that the actions of prosecutors were taken: (1) with the intent to goad or force him into requesting a mistrial in order to subvert double jeopardy protections; or (2) to avoid an acquittal. *See Masonheimer*, 220 S.W.3d at 507–08; *Lewis*, 219 S.W.3d at 336; *Coleman*, 350

S.W.3d at 160. The habeas court, after hearing testimony and reviewing evidence, found Martinez failed to meet his burden. Based on an examination of the evidence under the appropriate standard of review, and considering the *Wheeler* factors and LaHood's threats, we hold the habeas court was within its discretion in concluding Martinez failed to establish by a preponderance of the evidence that prosecutors intended to goad him into moving for a mistrial or feared an acquittal. *See Masonheimer*, 220 S.W.3d at 507–08; *Lewis*, 219 S.W.3d at 336; *Coleman*, 350 S.W.3d at 160. We therefore hold the habeas court did not abuse its discretion in denying Martinez's petition for writ of habeas corpus and affirm the habeas court's order.

Marialyn Barnard, Justice

PUBLISH